# WHEELING.

Sophia Schwarzbach *et al.* *v.* Ohio Valley Protective Union.

Submitted September 20, 1883.—Decided April 4, 1885.

1. A court ought not to exclude all the plaintiff's evidence from the jury on the defendant's motion, unless regarding the defendant as though he was a demurrant to the plaintiff's evidence, the court would find for the demurrant. (p. 641.)

2. A suit is brought by the wife and children on a life-policy issued on the life of a man for their benefit; they prove the issuing of the policy sued upon by the defendant; and that it was issued for the benefit of plaintiffs; that the man insured died more than six months before the bringing of the suit; that the proof of his death required by the policy to be delivered ninety days before the policy should be payable was delivered to the defendant more than ninety days before the suit was brought; that more than a month before the suit was brought the defendant refused to pay the policy when called upon by the plaintiffs to do so, and did so without making any objection to the proofs of death of the person whose life was insured, but the plaintiffs did not produce proofs of the death, which had been delivered to the defendant, though they could have produced them, and did not show that they had offered to deliver up the policy on payment of the amount to the defendant, the policy requiring the payment to be made after proof of the death of the insured upon receipt and surrender of the policy. HELD:

    On motion by the defendant to exclude the plaintiffs' evidence, this being all of it, the court did not err in overruling the motion (p. 642.)

3. In such a suit, the defendant having on demand of the plaintiff produced the proofs of the death of the insured, the court may properly allow the plaintiff to read to the jury the endorsements on the back of such proofs for the purpose of showing when they were received by the defendant, without requiring the plaintiff to read to the jury the proofs of death. (p. 643.)

4. If declarations in such cases were made by the insured as to his having had at some previous time a severe attack of sickness, in contradiction of his statement in the application for the policy, whether these declarations were made before or after the issuing of the policy being mere hearsay evidence, they are inadmissable as evidence against the plaintiffs. (p. 646.)

5. Though the policy provides for the amount named being paid upon

the receipt by the defendant of the policy, still, if the defendant positively refuses to pay the policy because unjust, the plaintiffs could sue upon it and recover without proving that they offered to surrender the policy on its payment.   (p. 648.)

6. A question asked of the examining physician and of a man engaged in the insurance-business as experts, as to what would be the character of the risk of a man's life, if within three months he had a hemorrhage of the stomach, was properly not allowed to be put or answered.   (p. 651.)

7. If the answers of the insured to the questions propounded to him on the application, which are made a part of the policy, are by the policy warranted to be true, this removes their materiality from the consideration of the jury; and if any of the answers are false in fact, the policy is thereby forfeited, though the answers were made in perfect good faith.   (p. 652.)

8. But in determining whether the answers by the insured in the application are warranties or representations, the court leans in favor of construing the policy as making them representations rather than warranties; and if a portion of the policy or application would indicate them to be warranties, but another portion of the application shows, that they were to be regarded as representations, the answers to these questions will not be regarded as warranted to be true.   (p. 653.)

9. Though the policy be construed as not warranting the truth of the answers of the insured, yet if these answers to specific questions are misrepresentations, the policy will be avoided, whether the court or jury regard the answers as material or not; for the parties by putting and answering such questions have declared, that they regarded them as material.   (p. 655.)

10. But a false answer to a question, in order to be such a misrepresentation as will forfeit a policy, must be fraudulently false, that is in making the answer the insured must be guilty of actual fraud or legal fraud.   By actual fraud is meant an intention to deceive; but legal fraud may exist, where there is no intention to deceive, as where the insured states in his answer, that he knows personally, that his answer is true, when it really is not true, or when the answer contains a statement which from its nature the insurers must necessarily regard as made on the personal knowledge of the insured, which statement is false, in both these cases the insured is guilty of a legal fraud, which will forfeit the policy, though the false statement was made without any intent to deceive but was the result of carelessness or forgetfulness.   (p. 655.)

11. But if the answer is such, as must have been made not on the personal knowledge of the insured but upon his best judgment and belief, as that he was of "sound body," and it be untrue, it will

still not forfeit the policy, if the answer was made in perfect good faith, and the insured had no suspicion, that he was unsound of body, though it be afterwards shown that he had then a fatal internal disease, of which he afterwards died. Perfect good faith is all that is required in such a case. (p. 656.)

12. If an agent of an insurance company fills up the answers of the insured in a printed form of application furnished to the agent by the insurance company and procures the insured to sign such application, and in this application the agent has filled up an answer to a question, which he never propounded to the insured, and the insured trusting to this agent never read the application, and did not know, that it showed any such question to have been put or answered, though he may have had an opportunity of reading the application either before or after he signed it, yet if such answer to such question so inserted in the application without the knowledge of the insured be false, it cannot operate as a forfeiture of the policy, as the making of such answer under these circumstances will not be regarded as the answer of the insured but as the act of the insurance company by its agent. (p. 661.)

13. If, when an insurance company issues a policy, it knows certain facts, which are material to the risk taken, it cannot claim a forfeiture of the policy because of the existence of these facts, though the insured in his answer to questions may have stated that such facts did not exist. (p. 665.)

14. If after the issuing of a policy certain facts become known to an insurance company, which, under the terms of the policy it has issued, would operate as a forfeiture of the policy, and the company, after it has acquired the knowledge of these facts continues to receive premiums from the insured or to levy assessments on him and to receive payment of these assessments from the insured, such conduct of the company will estop it from claiming, that such facts so known to it operate as a forfeiture of the policy. (p. 666.)

15. If a life-policy contains a provision, that the amount of the insurance shall be payable ninety days after the proof of the death of the insured is delivered to the company, and a suit is brought on such policy under chapter sixty-six of Acts of 1877, or under chapter seventy-one of Acts of 1882, section sixty-one, *et seq.*, and the defendant fails in his statement of defenses to state that he relies upon the failure of the plaintiffs to furnish these proofs of the death of the insured to the defendant before suit was brought, still the plaintiffs can not recover without proving, that they furnished these proofs of the death of the insured as required by the policy ; for this constitutes a part of the plaintiffs' case, and without this proof they do not make out a *prima facie* case; and it does not constitute a matter of defence and therefore need not be stated in the statement of the defences filed by the defendants. (p. 667.)

GREEN, JUDGE, furnishes the following statement of the case :

This was an action of *assumpsit* brought by Sophia Schwarzbach, widow of George Schwarzbach, and his infant children, John, Francisca, Gustavus and Louis, suing by their mother as their next friend, in the municipal court of Wheeling against the Ohio Valley Protective Union, a life insurance company of Wheeling. The declaration was that authorized by chapter sixty-six of Acts of 1877, and was upon the liabilities which were as follows :

" No. 2,162.                                    $2,000.

"(Chartered July 4, 1878, Principal office, Wheeling, W. Va.)

" In consideration of the representations, agreements and warranties made by George Schwarzbach of Wheeling, county of Ohio, State of West Virginia, in his application dated October 28, A. D., 1880, and the sum of ten dollars in hand paid and ten dollars to be paid yearly for four years after this date, and four dollars to be paid annually thereafter during his membership, and the further sums to be paid on death-assessments, as they become due on the death of members occurring after the date hereof, the Ohio Valley Protective Union issues to him this certificate of membership, with the following agreements :

" Ninety days after due proof and approval of the death of said George Schwarzbach, he having complied with the conditions of membership, the Ohio Valley Protective Union will pay to Sophia Schwarzbach and children, his wife and children, or — legal representatives, at the office of said association, in Wheeling, West Virginia, the sum of $2,000.00, less any portion remaining unpaid of the first four annual payments, upon due receipt and the surrender of this certificate. This certificate is issued by said association and accepted by said member upon the foregoing and following express conditions and agreements:

" 1. The person to whom this certificate issues agrees to pay to said association the above named annual sums on the 29th day of October of each year for the first four years and thereafter during his membership as above specified, and further agrees to pay, on the death of each member of the asso-
79

ciation, an assessment not exceeding three dollars and sixty cents.

" 2. The said annual dues and the said assessments shall be paid to the secretary of the Ohio Valley Protective Union at Wheeling, West Virginia, within *thirty days* after date of notice. A printed or written notice from the secretary of the association, duly stamped, sealed and directed to the address of the holder of this certificate as it appears on the books of the association, and deposited in the post-office at Wheeling, West Virginia, shall be deemed notice.

" 3. Due notice must be given to the secretary of the association by the holder of this certificate of any change of his post-office address. If any annual payment or any assessment is not received by the association within *thirty days* from the date of notice, then this certificate stands forfeited; provided that if it shall thereafter appear to the satisfaction of the association that proper remittance was made, so that by due course it should have been received within said thirty days, then, upon payment of all dues and assessments due and unpaid, shall forfeiture be waived.

"4. The application for membership and certificate of examining physician, upon which this certificate is based, are here referred to and made a part hereof the same as if fully herein written.

" 5. It is understood to be a part of this contract that the holder of this certificate, No. 2,162, having continued to be a member of this association in good standing for the period of twelve years, will, at his option, at the end of said period, be entitled to receive in settlement thereof a sum equal to thirty per centum of the amount named as the death benefit herein, and this certificate shall then be surrendered for cancellation.

" 6. By the acceptance of this certificate it is agreed that upon the maturity of a life benefit claim, an assessment shall be made upon the basis referred to in paragraph numbered one, and the same rule as to default in payment shall apply as in death assessments.

" 7. If the person to whom this certificate issues fail to make any payment when due, or if he personally engage in the manufacture of gunpowder, nitro-glycerine, dynamite, or

in mining or other hazardous employment or ventures, or if he enter or be engaged in any military or naval service, except the militia in time of peace, without in each of the foregoing cases having obtained the written consent of the association, or if he hereafter contract habits which tend to shorten life, or if he commit suicide, or if death be caused by engaging in a duel, or by his immorality, dissipation, drunkenness, or violation of law, or if any of the statements or declarations in the application for membership and certificate of examining physician, upon the faith of which this certificate issues, shall be found in any material respect untrue, then in every such case this certificate shall be null and void, and his membership shall cease, and all admission fees, dues, assessments and other moneys which may have been paid on account thereof, together with this certificate and any benefits to other person or persons at his death, as contemplated or intended by his membership or hereinbefore agreed to be paid, shall be forfeited to said association.

"In witness whereof, the said Ohio Valley Protective Union has hereunto affixed its corporate seal, and has caused this certificate to be signed by its president and secretary at the city of Wheeling, State of West Virginia, the 29th day of October, A. D., 1880.

"I. H. DUVAL, *President.*

"W. C. HANDLAN, *Secretary.*"

"N. B.—No agent of this association is authorized to receive assessments or annual payments, and any person so receiving does it as agent of the member and not as agent of the association.

"N. B.—All remittances are at the risk of the member, and should be by draft, postal order or registered letter, to the order of the treasurer, enclosed and addressed to the secretary of the Ohio Valley Protective Union, Wheeling, West Virginia."

Among other endorsements on the back of this policy were these words: "Blank proof of death will be furnished by the association upon application."

A copy of the policy was, as required by the act, filed with the declaration.

To this declaration the defendant pleaded *non assumpsit*

and the plea authorized by chapter sixty-six of the Acts of 1877; and issue was joined on them. The defendant filed with his pleas, as required by the act, a statement in writing specifying by reference thereto the particular clauses, conditions or warrants, in respect to which a failure or violation by the plaintiff is claimed, so as to defeat his right of action. The following is the statement:

" A defence to this action being that the action cannot be maintained because of the failure to perform and comply with, and violation of certain clauses, conditions and warranties in and upon the said policy, and certain others contained in and upon the application for membership, certificate of examining physician, by-laws, rules and regulations of the defendant, upon which the said policy was expressed to have been based, the following clauses, conditions and warranties are specified, in respect to which such failure and violation are claimed to have occurred, that is to say:

"In clause seven of the said policy, the clause providing that if the person to whom the said policy or certificate issued should thereafter contract habits that tends to shorten life, * * if death is caused by dissipation or drunkenness, * or if any of the statements or declarations in the application for membership and certificate of examining physician, upon the faith of which said certificate issued, should be found in any material respect untrue, then in every such case the certificate should be null and void.

"And in the said application for membership the following clauses:

"1. That at the beginning of the application declaring and warranting that the applicant was then of sober and temperate habits, in good health and sound body, and that he did usually enjoy good health.

"2. The question and answer in the paragraph marked No. 6 in said application.

"3. The answer in the paragraph marked 13 of the application to the questions as to spitting of blood and consumption.

"The questions and answers in the paragraphs of said application marked 17 and 18.

"5. The answers in paragraph 19 of the application about the applicant's brothers and sisters.

"6. The clause near the end of the application beginning with the words 'I hereby represent and warrant' and ending with the words "forfeited to said association." A copy of the said application is annexed hereto and referred to as part of this statement."

This statement was duly sworn to, as required by the act. The defendant also filed offsets to the bill of particulars claiming as an offset $40.00 the portions remaining unpaid of the first four annual instalments. And on motion of the plaintiffs the court ordered, that the defendant file a more particular statement under oath of the nature of its defence and the facts expected to be proved with respect to the matters set up in their statement; and at the next term this was filed as follows:

"For a more particular statement of its defence to this action based on the violation of and failure to perform and comply with certain clauses, conditions and warranties in and upon the policy sued on, and in and upon the application for membership upon which, in part, the said policy was expressed to have been based, with clauses, conditions and warranties are specified in the statement of defence heretofore filed, and to which reference is now made, the defendant says that the warranties and conditions contained in the fifth clause of the said policy (in said former statement inadvertently called the seventh clause), were broken in this, that the death of the said George Schwarzbach, deceased was caused by his dissipation and drunkenness; and in this also that the statements and declarations in said application for membership were found in material respects untrue in the following particulars, to-wit:

"1. The statement that the applicant was then of sober and temperate habits was untrue.

"2. The statement that he was in good health and of sound body was untrue.

"3. The statement that he did usually enjoy good health was untrue.

"4. The statement, in answer to question six that he was not and had not ever been addicted to the frequent or intemperate use of any alcoholic stimulant was untrue.

"5. The statements, in answer to questions in paragraph 13,

that the applicant had never had consumption or spitting of blood were untrue.

"6. The statement, in answer to question in paragraph 17, that the applicant had not had during the last seven years any disease or severe sickness was untrue.

"7. The statement, in answer to question in paragraph 18, that no brother or sister of the applicant had been affected with any pulmonary or hereditary disease was untrue.

"8. The statements, in answer to several questions in paragraph 19, that the applicant had not and had never had any brothers or sisters was untrue.

"9. The defendant relies on the facts hereinbefore stated and the untrue statements hereinbefore specified, as showing the untruth of the representations and the breach of the warranties contained in the clause in said application, beginning with the words 'I hereby represent and warrant,' and ending with the words, 'forfeited to the said association.'"

This statement was duly sworn to, as required by law.

The plaintiffs having filed a general replication to all the pleas, and issues being joined thereon, the plaintiffs further filed a statement in writing of the matter on which the plaintiffs intended to rely, which was duly sworn to. This replication or statement in writing was in the following words:

"Plaintiffs first join issue on the pleas filed in this cause by the defendant.

"Plaintiffs say that prior to decedent's death, the said several supposed matters set forth in defentant's statement filed in this cause (except as to the alleged death of George Schwarzbach from dissipation and drunkenness, and except as to the brothers and sisters of George Schwarzbach), if they ever existed, became and were fully known to defendant, and that thereafter and with such knowledge defendant made two assessments upon said George Schwarzbach on account of the said policy, which assessments were due and payable from him according to the terms of said policy; which said assessments were paid by the said George Scwarzbach to said defendant in order to continue in force said policy according to the terms thereof. And plaintiffs rely on these facts as a waiver on the defendant's part of the condition or

conditions and the several warranties of said George Schwarzbach in said statement alleged, and as estopping the defendant from relying on any such conditions as warranty or the violation thereof."

Subsequently, on November 1, 1882, the plaintiffs by leave of the court filed this additional statement in writing, which was duly sworn to :

" Plaintiffs say that as to the several matters alleged in defendant's statement filed in this cause to have been contained in an application in said statement mentioned, said George Schwarzbach did not make or authorize such application, but if there be such matters contained in such an application, they were written therein by defendant's agent acting within the scope of his duties as such agent, and that therefore defendant is estopped to set them up against these plaintiffs."

On November 2, 1882, a jury was sworn to try the issue joined, who on the 4th day of November, 1882, found for the plaintiffs and assessed their damages at $2,072.70. A motion for a new trial was made by the defendant, on which the court acted on the 11th day of November, 1882, and entered up a judgment for the plaintiffs for this $2,072.70 less $8.17, the plaintiffs remitting that sum ; and thereupon the court overruled the motion for a new trial. The judgment so entered was for $2,064.53 with interest thereon from the 11th day of November, 1882, and the costs incurred by the plaintiffs.

A bill of exceptions was taken by the defendant, which set forth all the evidence given at the trial, as taken down by a stenographer, which occupies more than 120 manuscript pages of the record. Of course there is in this great mass of evidence, taken down just as it occurred at the trial, a large amount of matter, which is utterly useless, so far as this Court is concerned. A great many questions, which were propounded, were excepted to by the opposing counsel, and when decided by the court to be improper and not allowed to be answered, these stenographer's notes state, were excepted to. This great mass of evidence I will endeavor to state only so far as I deem it important to decide the law-questions proper to be reviewed by this Court. Very much of this evidence was contradictory, and no good purpose is answered by setting it out in detail. The only effect of tak-

ing a bill of exceptions in this form is to lessen the labor of counsel in trying the case and in taking proper bills of exceptions, while it increases greatly the labor improperly imposed upon this Court and lessens the chances of doing justice by the risk, which is run, that this Court, in the time it can devote to the case, may fail in extracting from this great mass of matter the comparatively small portion of it really important to be considered. In reference to the exclusion of evidence by the court below I shall only take notice of those exclusions, which have been relied upon in this Court as erroneous and to the prejudice of the plaintiffs in error.

The plaintiffs' evidence, when construed, as it must be, most favorably for the plaintiffs, and regarded, as it must be, as proving all which the jury could fairly infer from it and as if it was believed by the jury, proved the following facts: The obtaining of the policy from the defendant as set out in the declaration was proven. The defendant at the request of the plaintiffs produced the proof of George Schwarzbach's death, consisting of the affidavits of Sophia Schwarzbach, Albert F. Stifel, Joachim Beuter and R. M. Friend, and the endorsements on said papers. This endorsement the plaintiffs' counsel offered to the jury as evidence without introducing the paper itself as evidence, to which the defendant's counsel objected, but the court overruled the objection and allowed the endorsement alone to be read, to which the defendant excepted. This endorsement was a printed form, portions of which, when there were blanks in it, were filled up. The parts filled up, which alone are important, were as follows: " The Ohio Valley Protective Union, Wheeling—Proofs of the death of George Schwarzbach, who died at Wheeling on the 22nd day of June, 1881. Submitted for examination and approval. Policy No. 2,162; amount $2,000.00 ; received September 15, 1881. The above blanks are to be filled up only at the office of the Ohio Valley Protective Union. All claims are payable only at the office of the Ohio Valley Protective Union, when due, on presentation of the policies properly receipted by the owner." The plaintiff then introduced a witness who proved that George Schwarzbach died June 2, 1881, and left a wife, Sophia, who had four children, John, Frances,

Gustavus and Louis, all living; that the witness, who was the administrator of the decedent, called at the office of the defendant on behalf of the widow and children a few days after the death of George Schwarzbach and several times afterwards; that on the 7th of November at the office the secretary of the defendant told witness, that several gentlemen had called at the office and asked, if he had been insured by the defendant.   Witness went to the office of defendant probably four times prior to November 7 with reference to the payment of this policy on behalf of the widow and children and was told, they would fill up the proof of his death, but they gave him no satisfaction with reference to paying the policy. They said that the board had not met, and they did not know about it.   They never said, that they were dissatisfied with the proofs of his death, after they received them, or that there ought to be any change made in them.   On November 25, 1881, he went there to ask payment of the policy again on behalf of the plaintiff, and was told by an officer of the defendant in the office, that the board of directors had concluded not to issue an assessment on George Schwarzbach's death.

The plaintiffs rested their case on this evidence; and the defendant moved the court to exclude all the plaintiffs' evidence from the jury, which motion the court overruled, and the defendant excepted.

The defendant then introduced the proofs of the death of George Schwarzbach, consisting of the affidavit of Sophia Schwarzbach, made September 13, 1881, in which were affidavits to the facts that he died June 22, 1881; that the cause of his death was hemorrhage from the stomach; that his health began to decline January 1, 1881, when he had a like attack; that he was ill a day and two nights; that he spat up blood in July or August, 1880; that he was well afterwards; that during these attacks he vomited blood; that he had typhoid fever some years before his death; that he had no other disease; that he used spirituous liquors but to what extent she does not know.

The physician's evidence before the jury re-states what was in his affidavit in proof of the death.   He states that the first attack in August, 1880, was the mildest of his at-

tacks and was alarming only to the extent, that any internal hemorrhage was alarming.   The next one in January, 1881, was not as severe as this first one, but he was sick from indigestion for some time afterwards.   The last one, of which he died in June, 1881, was of course the worst.   The disease was probably an ulcer of the stomach.   He was sick a week or two in his first attack in August, 1880.   He had then probably from three to five attacks of vomiting.   The blood vomited was sufficient to be observed by any one.   George Schwarzbach knew this, but he knew nothing of the cause of it probably, nor did  the physician then, and he could not have said that he was not in good  health, when he was insured by the defendant shortly afterward in October 29, 1880. But from the symptoms of this blood-vomiting, which occurred before that, and which occurred afterwards and finally caused his death, he would  conclude he was  not in good health when he was insured ; but he  could  not then have said he was not because of the uncertainty then as  to the cause of his having  once before vomited blood, and  the uncertainty whether the cause of the  blood-vomiting had not then been entirely removed.   His health appeared to be good.

It was  proposed to  prove  by  this witness, that  George Schwarzbach prior to his insurance made  statements to  this witness with  reference  to  a  severe  illness (typhoid fever), which he had theretofore had ; but the court  excluded the evidence and the defendant  excepted.

The medical examiner of the defendant was  then examined.   He proves that he saw  the application for this insurance signed by  George Schwarzbach, and  it was  filled up as it now is except the answers to  the thirteenth paragraph, which was an answer to  the question : " Have you ever had any of the following  diseases ?"   Followed by the names of a number of  diseases and  a uniform answer to each  " No." These answers were  then blank.   He states, he wrote the certificate on the back  of proofs of  death, but does not state, that he filled up these answers "No." to these questions.   To questions in  paragraph 13  in the application ; they were not filled up when the application was brought to him.   The court refused to permit this witness, who was a member of the Ohio Valley Protective Union, the defendant, and would

suffer pecuniary loss, if the plaintiffs succeed in this suit, to prove the admission by George Schwarzbach made at the time of this medical examination that he had signed the application, or that in the presence of this medical examiner he, Schwarzbach, signed what was on the back of it called " The certificate of examining physician." These signatures were afterwards proved by a clerk of the defendant. But the court still refused to admit the application and certificate of the examining physician to go to the jury, and the defendant excepted. But this application was afterwards allowed to go to the jury, Mrs. Sophia Schwarzbach admitting that it was her late husband's signature attached to it. The following are such parts of it as are regarded as material to be stated in the deciding of this case.

" I, George Schwarzbach, declare and warrant, that I am now of sober and temperate habits, in good health, of sound body and mind, and do usually enjoy good health." Question 6—"Are you or have you been addicted to the frequent or intemperate use of any alcoholic stimulant or opiate?" Answer—" No." Question 13—" Have you ever had any of the following diseases? Answer yes or no to each and state number, character and duration of each attack you have had of any of them. Affection of liver? No. Disease of the heart? No. Cancer or tumor? No. Dyspepsia? No. Rheumatism? No. Palpitation? No. Neuralgia? No. Apoplexy? No. Pleurisy? No. Scrofula? No. Rupture? No. Piles? No. Fits? No. Asthma? No. Habitual cough? No. Disease of the urinary organs? No. Spitting of blood? No. Fever and Augue? No. Pneumonia? No. Consumption? No. Paralysis? No. Aneurism? No. Insanity? No. Syphilis? No. Dropsy? No. Gout? No. Vertigo? No. Yellow Fever? No. Bronchitis? No. Fistula? No."

The 17th, 18th and 19th questions and answers are as follows: Question 17—" Have you had during the last seven years any disease or severe sickness? If so, state the particulars of each case and the name of the attending physician? Answer—" None." Question 18—" Has either of your parents or any brother, sister or other near relation of yours been affected with rheumatism, insanity, or with any pulmonary,

scrofulous or hereditary disease? If so, state fully."
Answer—"No." Question 19: "What blood relation, if
any, exists between your parents? Answer—"None." "Is
your father living or dead?" Answer—"Dead." "Age, if
living, or at death?" "Sixty." "Health, if living, or cause
of death? "Piles." "Is your mother living or dead?"
"Dead." "Age, if living, or at death?" "Fifty-five."
"Health, if living, or cause of death?" "Don't know."
"How many brothers living?" "None." "Ages?" ——
"Health?" —— "How many sisters living?" "None."
"Ages?" —— "Health?" —— "How many brothers
dead?" "None." "Ages at death?" —— "How many
sisters dead?" "None." "Ages at death?" —— "Causes
of death?" ——

This application concludes thus: "I hereby represent and
warrant that the statements and answers above and herein
made, and the statements accompanying are true and correct;
and I have not concealed, withheld or misrepresented any
material circumstances or fact of the past or present state of
my health, constitution or habits of life, with which the man-
agers of the Ohio Valley Protective Union ought to be made
acquainted, or which renders me unfit for membership in said
association; that those answers and statements not written by
me were written upon my dictation and at my request, and
constitute warranties on my part and together with the by-
laws, rules and regulations of the Ohio Valley Protective
Union shall be the basis and form a part of the terms, condi-
tions and contract of my membership therein; and if the
same be in any material respect untrue or false or tends to de-
ceive said association, or if habits of life are contracted here-
after which tend to shorten life, or if death be caused by any
immorality, dissipation, drunkenness or violation of the laws
of the land, or while engaged in military or naval service, or
if I fail to pay or cause to be paid any dues or assessments on
or before the time they are due and payable, then and in either
event the contract shall be void, and my membership cease
and terminate, and all fees, dues and assessments which may
have been paid on account thereof, together with my certi-
ficate of membership and any benefits to other persons at
my death as contemplated by my membership shall be for-

feited to said association.   By the approval of this application the said association agrees that except for a death or life-benefit no assessment shall be made, and that but one assessment shall be made for each death or life-benefit, and that no assessment shall be made for a death or life-benefit if the remainder of a former assessment will pay such death or life-benefit.

"Dated this 28th day of October at Wheeling, West Virginia·
" George Schwarzbach, *Applicant.*"

The statement of the person, Henry C. Peterman, who, as the certificate states, solicited the application, was also produced in evidence.   It stated that he knew that George Schwarzbach, the applicant, in above application named, and described in the accompanying medical examination, and that they were the same person; and that he, Peterman, saw nothing in the form, figure, manners, customs or appearance of the applicant which indicates ill-health, a feeble constitution, irregular habits or intemperate living; that he had known him for eight years and believes, that he is in good health and is physically, mentally and morally a safe and insurable risk, and recommends him to membership.   This was signed by Henry C. Peterman and read to the jury and also the certificate of the examining physician, which was read to the jury, is endorsed on the application, and is a long document, which need not be set out at length.   It will suffice to say, that it was an entirely satisfactory examination and certificate except the answer to the seventh question, which was as follows:   " Is he free from any tendency to cough, catarrh, vitiated expectoration, *spitting of blood,* difficulty of breathing or disease of the throat?"   Answer—" No."   The 13th question is: " Are his parents dead, and, if so, of what disease did they die, and at what age?"   Answer—" See application."   The 14th question is: " Are there any hereditary diseases in the family, and if so, what are they?"   Answer—" No." To this examination is appended the following statement:

" I hereby declare, that I have given true answers to all questions put to me by the medical examiner, and that I am the same person described in the accompanying application.
" George Schwarzbach, *Applicant.*"

An attempt was made by witnesses to prove, that he was

not of sober and temperate habits; but it was only proven, that he drank beer some times, not that he was intemperate. This was the substance of the defendant's evidence.

In rebuttal the plaintiffs proved by the witness, who had called at the defendant's office, as stated before, shortly after the death of George Schwarzbach on November 7, 1881, he had a conversation with the secretary of the Ohio Valley Protective Union at the office of the defendant, of which he took a memorandum in writing directly afterwards, which states correctly what was said. This memorandum is as follows :

"WHEELING, W. VA., November 7, 1881.

"I went to see Mr. W. H. Handlan, secretary of the Ohio Valley Protective Union, about the insurance of George Schwarzbach. Dr. Campbell was there. Mr. Handlan then for the first time told me, that shortly after Schwarzbach was insured, several gentlemen came to the office and asked him whether they had insured George Schwarzbach, and that they thought he should not have been insured. One gentleman, a good party, even informed him, W. H. Handlan, shortly after he was insured, that he had the hemorrhage at Pittsburgh and on the train coming down, and that they then talked the matter over with the doctor in their presence, and had then concluded to cancel his policy, but it was somehow never done—why, he did not know. I told him then that that was the very time to cancel his policy, to give him a chance. He said yes, they ought to have done it, but then they somehow did not. He also said that they had a talk with Louis Gaus about it, but Louis Gaus told them that he was a cousin to him and did not want to say anything about him, but it proved afterwards that he was only a cousin to his wife. But one thing Handlan said he was very sorry that he did not cancel George Schwarzbach's policy right then. He also said that Peterman had insured George Schwarzbach and was the only one he ever did insure. He also said that George Schwarzbach had a hemorrhage at some fishing party out the pike."

He further stated, that the secretary of the defendant did not at that time tell him, that the company would not pay this policy. On the 25th day of November the secretary told

him that the company would not pay, or rather that the board would not make an assessment.

The secretary of the defendant testified, that the proofs of the death of George Sehwarzbach were filed in the office on September 15, 1881. In speaking of the conversation he had on November 25, 1881, with the person, who came for the plaintiff's to enquire, whether the defendant would pay this policy, he testified that he " told him that the board had declined to assess for the claim, believing that it was not a just one, and that they would not assess the members." He does not recollect the conversation after George Schwarzbach's death stated in the memorandum made by this witness. He don't think he said anything of the sort. Mr. Peterman proved that he had been an agent of the defendant to get applications for insurance. He states that in getting the application from George Schwarzbach he read to him some of the questions in the application, and some he did not think he asked in reference to his father's and mother's age, but in reference to himself he knew pretty near as well as he did himself, because we had almost always been together every day, but he did ask him some questions. But he asked him no questions about diseases, because he knew he had never been sick but once, and that was four or five years before his death. The secretary of the defendant had told him two or three days before this application was made, that George Schwarzbach was a good risk, and told him to get his application. The application was written or filled up in the saloon of George Schwarzbach by the witness; he does not know whether he read it or not. It was in his hands but he was talking about other matters at the time. He was an intelligent man and could read English. He did not then know of his vomiting blood in the August preceding, or that he was sick. He did not write any of the answers to question No. 13, in which to the questions whether he had a long list of diseases the answers are written. "No." These answers were not in his hand-writing. They have been inserted since he, Schwarzbach, signed this application. He wrote nothing on this application but his name. These answers were not written in his (witness's) presence. He says he asked him very few of the questions. He took it for granted from what

he had known he had no brothers or sisters, and that was the reason he did not ask him about that, but wrote the answers that he had known without asking. He had said to witness he would like to be insured by the defendants. He was paid by the defendant for the getting of this application. It was the only one he got on which a policy was issued. He only got one other application, which was rejected, and he got no pay for it. It was proven that the first assessment paid by George Schwarzbach to defendant was March 24, 1881, and another was paid April 3, 1881, and a third May 31, 1881, each of these assessments were $3.60. He paid his admission fee of $10.00 but not the $10.00 due annually thereafter for four years. The evidence justified the amount of the verdict rendered by the jury after the abatement by the plaintiff of $8.17 provided the plaintiffs were entitled to recover. The following instructions were given by the court at the instance of the defendant:

"INSTRUCTION NO. 1.

" There can be no waiver of the avoidance of a policy by reason of material false statements or misrepresentations in the application, unless the acts relied upon as showing the waiver were done with full knowledge of the facts. While, therefore, the receipt of premiums or assessments, with full knowledge on the part of the defendant of facts working a forfeiture of the policy, might constitute a waiver of such forfeiture, yet the receipt of such premiums or assessments in ignorance of such facts would not constitute a waiver. If, then, the jury believe from the evidence that the policy or certificate sued on was forfeited or avoided by reason of false statements respecting material facts made by George Schwarzbach in his application, and that the defendant, when it accepted assessments from him, did not know that such statements were false, then the acceptance of such assessments would not constitute a waiver of such forfeiture or avoidance.

"INSTRUCTION NO. 2.

" A misrepresentation or false statement made in his application for insurance by the person, whose life is *usual*, respecting a material fact, avoids the policy issued upon that application, and this, whether the misrepresentation was made in-

nocently or designedly. If, therefore, the jury believe from the evidence that George Schwarzbach, in his application for the policy or certificate here sued on, stated that he had no serious illness, or stated that he had not had during the last seven years any disease or severe sickness, and that either of those statements was false in any respect deemed by the jury material, then, whether the said Schwarzbach intended to deceive or not, the said policy or certificate is void, and the jury should find for the defendant, unless they further believe that the avoidance of the policy or certificate has been waived by the defendant in the manner elsewhere explained

" INSTRUCTION NO. 3.

" The statements and answers in the application, although written by Peterman, and although Peterman may not have asked George Schwarzbach all the questions contained in the application, should nevertheless bind the plaintiffs, if the jury believe from the evidence that George Schwarzbach either saw or had the opportunity to see the application after the statements and answers were written therein and before it was delivered to the defendant, unless the jury believe that Peterman was informed of or knew the facts as they actually were, and either fraudulently or designedly or negligently wrote false statements in the application, but such statements and answers should only bind the plaintiffs so far as they are by the jury deemed material, and they will not warrant a verdict for the defendant if the jury believe that an avoidance of the policy based on such statements has been waived by the defendant in the manner elsewhere explained."

A writ of error and *supersedeas* was awarded to the judgment of the municipal court upon the petition of the defendant, The Ohio Valley Protective Union.

*H. M. Russell* for plaintiff in error.

*W. P. Hubbard* for defendant in error.

GREEN, JUDGE:

The first question presented by the record is: Did the municipal court of Wheeling err in overruling the motion of the defendant to exclude all the plaintiff's evidence from the jury? The court ought not to have excluded the plaintiff's

evidence from the jury on this motion of the defendant, unless regarding the defendant, as though he was a demurrant to the plaintiff's evidence, and the plaintiff as a demurree and considering the plaintiff's evidence with all the favor and giving to it all the force and drawing from it all the inferences, it would be entitled to, if there had been a formal demurrer filed thereto, the court would feel itself bound to find for the demurrant and render a judgment for the defendant. But if on such a demurrer to the plaintiff's evidence the court would have felt itself bound to render a judgment in favor of the demurree, the plaintiff, then it did not err in refusing to exclude all the plaintiff's evidence from the jury. (Point 1, of syllabus in *Dresser* v. *Transportation Company*, 8 W. Va. 553.) Now where the plaintiff's evidence is considered, as it must be on this motion in order to exclude it from the jury, with all the favor with which the evidence of the demurree is construed on a demurrer to the plaintiff's evidence, such motion would be properly overruled in such case as this. As a demurrer to evidence or, as we have seen, a motion to exclude from the jury the plaintiff's evidence withdraws from the jury, the proper triers of facts, the consideration of the evidence, by which they are to be ascertained and the party, whose evidence is thus withdrawn from its proper forum, is entitled to have it most benignly interpreted by the substituted court, the plaintiffs below in this case, ought to have all the benefit, that might have resulted from a decision of the case by the proper persons, the jury. (*Miller, &c.* v. *Insurance Company*, 8 W. Va., point 2 of syllabus.)

The evidence being thus weighed, we must regard the plaintiffs' evidence, which was moved to be excluded, as having proven their case. It proved that the defendant had issued the life-policy sued upon to George W. Scwarzbach for the benefit of the assured, his wife and children, the plaintiffs in this suit; that he died June 22, 1881; that the proofs of his death required by the policy were received by the defendant September 15, 1881; that about two months afterwards, on November 25, 1881, the defendant refused, when called upon by the agent of the plaintiffs, to pay the amount of this policy and made no objection to the proofs of

the death of the party insured.   It is not disputed, that, if
the plaintiffs' evidence thus benignly construed establishes
these facts, the court below did not err in refusing to exclude
it from the jury; for this proof was sufficient to make out
plaintiffs' case. (See *Insurance Company* v. *Francisco*, 17 Wal.
672.)   But that these facts could all of them be deduced from
the evidence, even when thus benignly construed, is contro-
verted.   It is denied, that the evidence justified the conclu-
sion, that the defendant received the proofs of the death of
the assured on September 15, 1881.   It seems to me clear
beyond controversy, that this fact was well established by
the evidence, even if it was not thus benignly construed in
favor of the plaintiffs.   The defendant at the instance of the
plaintiffs produced what was admitted to be the proofs of the
death of the insured ; and on the back of these proofs pro-
duced by the defendant was endorsed "received September
15, 1881."   The word received being printed and a blank
left after it for the date, which was filled up "September 15,
1881."   This paper had also endorsed on it, "Proofs of the
death of George Schwarzbach, who died at Wheeling on
June 22, 1881," and also "The above blanks are to be filed
only at the office of the Ohio Protective Union," the defendant
below. Yet it is contended in this Court, that this does not prove
that these proofs of the insured's death were received by the
defendant September 15, 1881, because, it is said, the mean-
ing of " Received September 15,  1881," is doubtful, and be-
cause it was not proven to have been made by the defendant,
and it might have been put there by some one else.   Such a
conclusion from this evidence would have been most unjusti-
fiable and certainly could not possibly be reached, if this evi-
dence were to be benignly construed in favor of the plaintiffs
below.

But it is said that these endorsements ought not to have
been permitted to go to the jury, unless the plaintiffs also sub-
mitted to the jury the proofs of the death of the insured con-
tained on the face of the paper so endorsed by the defendant,
because a party offering in evidence a written paper must
offer the whole, and when a plaintiff offers a paper, his oppo-
nent is entitled to insist, as he did in this case, that the whole
be introduced as a part of the plaintiffs' case.   No one dis-

putes this proposition. But it seems to me obvious, that the proofs of the death contained on the face of this paper, which had been made out some time before and signed by one of the plaintiffs and by others, was an entirely different paper from those endorsements made by the defendant on September 15, 1881. What was contained in these endorsements might just as well be made on the books of the defendant, as probably they were, or on some other and different piece of paper; and surely then no one could pretend, that these proofs of the death of the insured and these entries made on a different piece of paper subsequently by the defendant or on its books were part and parcel of the proofs of death. And it seems to me clear that the fact, that the defendant thought proper to put the matters contained in these endorsements on the back of the proofs of death of the insured for its convenience, in no way alters the case. They still constitute no part of the proofs of the death of the insured. They constitute still in law a separate and distinct paper and were not at all necessary to make out the plaintiffs' case. (*Insurance Company* v. *Francisco*, 17 Wall. 672; *Thurston* v. *Murray*, 3 Binney 326.) In fact the contents of this proof of the death of the insured could not have been used as evidence for the plaintiffs, they being nothing but *ex parte* affidavits. (*Lycoming Insurance Company* v. *Robin*, 77 Ill. 402–8; *Lycoming Insurance Company* v. *Schriffler*, 42 Pa. St.; *Commonwealth Insurance Company* v. *Sennet*, 41 Pa. St. 161.) All that the plaintiffs could have produced them for would have been to show, that they were the proofs of the death of the insured required by the policy to be delivered to the defendant below. And that this was their character was admitted by the defendant below, when it produced them as such on the demand of the plaintiffs, and also by the express statement in the endorsement, that they were the proofs of the death of the insured.

As this suit was instituted on January 3, 1882, it obviously was not brought too soon, for by the policy the insurance was payable ninety days after the delivery to the defendant of these proofs of the death of the insured. Probably it might have been instituted on the November 25, 1881, when the defendant refused to pay the policy and made no objection to the proofs of the death of the insured, which it had

received on September 15, 1881.   It is said in the argument by the counsel for the defendant below, the plaintiff in error, that when a contract is to be performed at a future day, a denial of liability before the day gives the plaintiff no right to sue, until the time has expired, as the defendant may after all pay on the day fixed, and there will be no breach of the contract.   To sustain this position counsel cites *Phitpotts* v. *Evans*, 5 M. & W. 475 ; *Ripley* v. *McClure*, Welsb. H. & Gord. 345.   The counsel for the defendants in error, the plaintiffs below, insist, that the law is not properly laid down in these cases and that they have been overruled and cites *Ford* v. *Foley*, 6 B. & C. 325 (55 E. C. L. 388) ; *Lovelock* v. *Franklyn*, 8 Ad. & El. N. S. 371 (55 E. C. L. R. 371) ; *Short* v. *Stone, Id.* 388 ; and especially *Rochster* v. *DeLatour*, 20 E. L. & E. 160, and *Cort* v. *Ambergate Railway Company*, 6 E. L. & E. 237, all cited in 1 Rob. (new) Pr. 452–5.   On this point counsel for the defendants in error, also cited *Norwich and New York Trans. Company* v. *Western Massachusetts Insurance Company*, 34 Conn. 561 ; Same Case, 12 Wall. 201 ; *Allegre* v. *Maryland Insurance Company*, 6 Harr. & J. 408, 413 ; *Cobb* v. *Insurance Company*, 11 Kan. 93 ; *Ætna Insurance Company* v. *McGuire*, 51 Ill. 342, 352 ; *McComas* v. *Covenant Insurance Company*, 56 Mo. 573, 576.   The last, while differing somewhat from the other cases, is nevertheless like them in conflict with the cases from Welsb. H. & G. cited by the counsel for the plaintiff in error.   These cases establish the position, it is claimed by the counsel for the defendants in error, that a refusal to pay by an insurance company is a waiver of the stipulation allowing the company ninety days, within which to pay the loss, and that suit may be brought on the policy as soon as the company refuses to pay the policy ; though the Missouri case holds that suit can not be brought until ninety days after the death of the party, though the company has refused to pay.   But according to the view I have expressed, this question so fully discussed by counsel need not be decided, as the plaintiffs' case was sustained by his evidence, when this motion was made to exclude the evidence ; and this suit was not brought too soon, it being more than ninety days after the receipt of the defendant of the proofs of the death of the insured.   It is therefore imma-

terial, whether the defendants by refusing to pay the insurance waive the benefit of the provision of the policy, that the insurance should be payable ninety days after proof of insured's death.    We shall therefore express no opinion on this subject.

The next question I will consider is: Did the court below err in refusing to permit the defendant below to prove the statements made by George Schwarzbach, the insured, prior to his application, which contradicted his statements contained in his application for this policy of insurance in reference to his having had serious sickness within seven years before making this application and in reference to his having brothers and sisters? When this evidence was offered, it was not stated by the defendants below, that these statements with reference to his health had been made about the time of his application for the insurance, or that they were statements relative to his health when these statements were made, but relative to his having had serious sickness some time prior to these statements. For all that the record shows, these statements may have been made years before.

The decisions on the question of the admissibility of declarations made by the insured, when the insurance is for the benefit of others as in this case, are somewhat conflicting. In *Averson* v. *Kinnard* 6 East. 188, it was held, that in an action by a husband on a policy of insurance on his wife's life declarations made by the wife to an acquaintance, while lying in bed in the daytime apparently ill, that she was in bad health and had been sick for some time and was sick, when she went to Manchester a few days before to get a certificate of her good health preparatory to getting this policy of insurance on her life in favor of her husband, and that she was afraid she would not live ten days, when the policy would be returned, and her husband would lose the benefit of the insurance, were proper evidence to show her ill state of health, when the policy was issued. In *Kelsey* v. *Union Life Insurance Company*, 35 Conn. 225, in an action by a husband on his policy on his wife's life letters of hers written a few days before the application was made, in which she spoke of her health as very bad, were held admissible to contradict the policy was issued, she was in bad health.

These cases were decided partly on the ground that these declarations were a part of the *res gestæ.* But the reasoning of the court in these cases especially and the decisions have not been approved in other cases. In *Fraternal Mutual Insurance Company* v. *Applegate,* 7 Ohio St. 92, where the suit was on a policy on the husband's life for the benefit of his wife, it was held, that the admissions of the husband, after the policy was issued, were not competent evidence against the plaintiff. The court say : "They are not the declarations of a sick person in relation to his condition at the time of making them. * * * They were not against his interest. * * * They were not the statements of one, who had been a witness in the trial, offered to impeach his credit. * * * They were therefore mere hearsay." It is evident, that had the declarations of the husband been in this case made with reference to his health at some previous time, and these declarations had been made before the policy was issued, on the reasoning of the Ohio case they would have been necessarily rejected as mere hearsay. The same views were taken in *Washington Life Insurance Company* v. *Hunay,* 10 Kan. 525, and speaking of the English and Connecticut cases before cited, the court say : "In both cases, however, they were considered by the courts as being so near the application as to be properly a part of the *res gestæ.* * * * While it may be doubted whether the reasons given for these two decisions are good, still they in no wise conflict with the well-settled principles, upon which other cases were and this must be decided." In accordance with these views it has been held that statements as to health made by the insured some months prior to the insurance to persons other than the company or the physician were inadmissible. (*Swift* v. *Massachusetts Mutual Life Insurance Company,* 2 N. Y. Supreme R. 303 ; see also *Reed* v. *N. Y. C. Railroad Company,* 45 N. Y. 574.) So the previous declarations of the insured as to his habits have been held mere hearsay and inadmissible against the assured, (*Rawls* v. *American Mutual Life Insurance Company,* 36 Barb. 357,) and his statements subsequent to the issuing of the policy are equally inadmissible, (27 N. Y. 282.) These authorities as well as reason lead me to the conclusion, that the court below did not err in refusing to admit any of the

declarations of the insured made to third persons at or about the time the policy was issued either as to the former state of his health, his having formerly had severe sickness, or as to his having had brothers and sisters.    These declarations were all mere hearsay and can not be used as against the plaintiffs. The insured, who made them, had no interest in the policy, most if not all these declarations having been made long before the policy was issued.    Even if made afterwards, they were equally mere hearsay ; he never did have any interest in the policy.    He was not a witness in this case, so as to permit his evidence to be thus contradicted ; nor were they declarations of a sick person relative to his condition at the time of the making of these declarations.

It is further insisted by the counsel of the plaintiffs, that, as the policy provided, "that the amount named therein should be paid on the receipt of the policy", therefore the surrender of the policy at the office of the defendant below was made a condition of the payment.    It was, it is claimed, one of two dependent covenants, on the performance of which the right of the plaintiffs depended, as in *Kern* v. *Zeigler*, 13 W. Va. 716 and *Roach* v. *Dickison*, 9 Grat. 154. Suppose, as is claimed, that this was one of two dependent covenants, still there was, as appears by the evidence in this case offered by the plaintiffs in the opening of the case, strengthened by the evidence subsequently offered, no necessity for the plaintiffs to prove that they either surrendered or offered to surrender the policy to the defendants.    It was sufficient on the proofs in this case to show, that they were ready to perform this or surrender the policy but were prevented from so doing by the defendant.    It was proven that the defendant on November 25, 1881, refused to pay this policy and, as was subsequently shown by the evidence, expressly based this refusal on the ground that the demand was unjust; and, as it was proven on the opening of this case, the jury would have had a right to infer, that the defendant refused to pay this policy when demanded, because it deemed the demand unjust.    It became of course a useless ceremony for the plaintiffs after that to present this policy to the defendant formally and offer to surrender it upon payment of its full amount.    As a matter of course they were and still

are ready and able to perform this, whenever the defendant pays the amount due on this policy; for to keep it, after such payment in full was made, could be of no possible use to the plaintiffs.

That this is the law governing cases where concurrent dependent covenants exist, as it is insisted by the counsel of the plaintiff in error was the case in this policy, clearly appears from *Kern* v. *Zeigler*, 13 W. Va. 707, the case relied upon by the counsel for the plaintiffs in error. It is there laid down in this language: "The covenants declared on are clearly dependent, and unless the excuse for not performing it is valid, the count is clearly bad. *Roach* v. *Dickinson*, 9 Grat. 154. In *Clark* v. *Franklin*, 7 Leigh. 7, Tucker, President, said, 'Nothing is more true, than that, when a contract is entire, and the covenants are dependent, the plaintiff is generally obliged to aver and prove a complete performance of all that was to be done and performed on his part, before he is entitled to demand payment from the other party. But to this well established rule, there is the equally well established exception, that, where the defendant has prevented a performance by the plaintiff on his part, it is not necessary, that the plaintiff should aver or prove a complete performance to entitle him to his action. He may recover without doing so, and it is sufficient to show a readiness to perform, and that he was hindered by the defendant. See *Gas Company* v. *Wheeling*, 8 W. Va. 369, opinion by Haymond, Judge; *Smith* v. *Lewis*, 24 Conn. 621; *Borden* v. *Borden*, 5 Mass. 67; *Smith* v. *Smith*, 25 Wend. 405.'" See also *Williams* v. *Bank of U. S.*, 2 Peters 96; *Ripley* v. *McClure*, 4 W..H. & G. 344, 358-9. These cases establish, that, even had it been the duty of the plaintiffs under the policy to surrender it or offer to surrender it, before the defendant was bound to pay, the positive refusal of the defendant to pay the policy, because there was no just demand created by it upon the defendant to pay, dispensed with any obligations, which might have been on the plaintiffs to offer to surrender this policy on its payment, before they could bring suit upon it and recover, if anything was due.

Another assignment of error argued at much length by the counsel for the plaintiff in error is the rejection by the court

below of certain communications or conversations had personally with George Schwarzbach by the examining physician of the defendant, when the certificate of the examining physician was being prepared as a preliminary to the issuing of the policy sued on. The plaintiffs below, defendants in error insisted in the municipal court, as they still insist in this Court, that these conversations between George Schwarzbach and this examining physician were inadmissible as evidence since the death of George Schwarzbach under chapter one hundred and thirty, section twenty-two of our Code, as amended by chapter one hundred and sixty of Acts of 1882, because this examining physician was then, and has ever since continued to be a member of the defendant's company, and if the plaintiffs in this suit recover, will have to pay a portion of the judgment. As the rejection of these conversations as evidence in my judgment could not have prejudiced the defendant, as I shall presently show, I deem it unnecessary to determine whether their rejection was right or wrong. The plaintiff in error to support his position on this point refers to the following cases. *Metz* v. *Snodgrass*, 9 W. Va. 194; *Hildebrant* v. *Crawford*, 65 N. Y. 107; *Carey* v. *White*, 59 N. Y. 340; *Mattoon* v. *Yong*, 45 N. Y. 699; *Swan* v. *Snow*, 11 Allen 224; *McClure* v. *Johnson*, 36 Iowa 620; *Barry* v. *Insurance Company*, 59 N. Y. 387. The counsel for the plaintiffs below, the defendants in error, rely on the following cases to sustain their position on this point: *Mattoon* v. *Yong*, 45 N. Y. 690–699; *Zane* v. *Fink*, 18 W. Va. 754; *Martz* v. *Martz*, 25 Grat. 36; *Dewey* v. *Goodenough*, 56 Barb. 54, 58–9.

Every fact, which the court below refused to allow this examining physician to testify to, which could have influenced the jury in their verdict, had already been proven by this examining physician without objection, or were proven during the progress of the case. These facts were, that the agent of the defendant, who obtained the application of the defendant for this policy, was present, when this application was handed to the examining physician to obtain his certificate upon it; that George Schwarzbach admitted his signature to the application to be genuine; the signature of George Schwarzbach to the declaration at the end of the examining physician's certificate; that when brought to the examining

physician the application of George Schwarzbach was just as it was at the trial of the case, except the answer to question 13; and the application for membership of George Schwarzbach and the certificate of examination. These were all the matters, which were proposed to be proven by the examining physician, which the court would not allow him to prove. The first of these matters he had on a former examination during the trial of this case been permitted to prove without objection, and all the other matters were proven by other witnesses, and these papers at that time rejected were afterwards submitted to the jury as evidence. These facts were none of them disputed by the plaintiffs below, the defendants in error; and their formal rejection, when offered to be proven by the examining physician, if improper in the court below, could not have prejudiced the defendant below, the plaintiff in error, and for that reason such an error by the court below would furnish no ground for the reversing of the judgment below, especially as the record shows that this examining physician was permitted without objection to respond to all other questions, and that the counsel for the defendant below specified all the above matters and none others as what he wanted to prove by him, which the court did not allow.

A question to one witness was objected to, not because it was in itself improper, but because it was not proper on a cross-examination. The question and answer show, that the defendant could not have been prejudiced by their admission at that stage of the examination rather than at another; and I therefore deem it unnecessary to consider such objection.

The examining physician of defendant was asked by the defendant: "What would be the character of the risk on a man's life, if within three months before he applied for insurance he had a hemorrhage of the stomach?" An insurance agent, who for many years had been connected with the life-insurance business as a superintendent and inspector of agencies and of the appointment of medical examiners, was asked by the defendant: "What is the custom of insurance companies generally with reference to receiving or rejecting an applicant for insurance, who has within three or four months before making his application had a hemorrhage of

the stomach?" The plaintiffs objected to these questions; and the court refused to permit them to be answered. The first question was then propounded to the second witness; and the court would not allow it to be answered. The counsel for the plaintiff in error refers to *Luce* v. *Dorchester Insurance Company*, 105 Mass. 298, to show, that the court ought to have allowed these questions to be answered by these witnesses, and the counsel for the defendants in error refers to the following cases to show, that the court did not err in rejecting this proposed expert testimony : *Raube* v. *American Life Insurance Company*, 27 N. Y. 282–293; *High* v. *Guardian Mutual Life Insurance Company*, 53 N. Y. 603; *Mutual Benefit Life Insurance Company* v. *Wise*, 34 Md. 582, 602; *Bryan* v. *Peabody Insurance Company*, 8 W. Va. 605; *State* v. *Watson*, 65 Me. 74; *Hartford Insurance Company* v. *Hosmer*, 2 Ohio St. 432. An examination of these authorities satisfies me, that the court below did not err in rejecting the evidence proposed to be introduced as expert evidence. It was entirely immaterial what description of persons companies engaged in the business of life-insurance would consider good or bad risks. The inquiry did not relate to matters of science or skill; but opinions of witnesses were in effect asked as to what persons engaged in a particular business would consider prudent to do in certain cases. Such an opinion could in no manner enlighten the jury in the matters at issue, but would only have tended to mislead. The court properly refused to allow these miscalled questions to experts to be answered.

The next important question in this case is : " What is the construction of this policy ? Were all the answers made by the applicant to the questions propounded on his application warranted to be absolutely true; or could the jury consider whether the answers given, which were not true in whole or in part, were material or immaterial, and whether they tended in any way to injure the defendant below by misleading it and inducing it to enter into a contract and issue a policy, which it might possibly have declined, had true answers been given to the questions ? The authorities all agree, that if by the contract and policy the applicant warranted his answers to be true in all respects, then this removes their materiality

from the consideration of the jury or of the court; and if the answers are any of them untrue, though they be such as the court or jury might believe could not have prejudiced the defendant nor in any degree influenced the defendant in entering into the contract or issuing the policy, yet the insured or person, for whose benefit the policy was taken, can not recover upon it. For the parties to the contract have for themselves declared, that every question and answer should be regarded as material, and an untrue answer should avoid the policy. See *Ætna Insurance Company* v. *France et al.*, 94 U. S. 510; *Jeffries* v. *Life Insurance Company*, 22 Wall. 47; *Foot* v. *Ætna Life Insurance Company*, 61 N. Y. 571; *Powers et al.* v. *Northeast Mutual Life Association*, 50 Vt. 630; *Co-Operative Association* v. *Leflore*, 53 Miss. 2 syl. 4 & 5.

But in ascertaining whether the answers to questions put to the applicant are warranties or representations, it should be borne in mind, that, when a policy contains contradictory provisions, or is so framed as to render it doubtful, whether the parties intended, that the exact truth of the applicant's statements should be a condition precedent to any binding contract, the construction which imposes on the insured the obligations of a warranty should not be favored. (*National Bank* v. *Insurance Company*, 95 U. S. 673.) The case of *Washington Insurance Company* v. *Raney*, 10 Kan. 525, was one, in which this principle of construction was applied, and the answers of the insured were not regarded as warranted to be absolutely true.

There is in this contract and policy certain phrases that taken by themselves would be warranties of the truth absolutely of the answers by the applicant to the questions propounded to him, whether they were material or not, while in other portions of it there are provisions, which seem to qualify or contradict this warranty of the truth of these answers without regard to their materiality or the good faith with which they were made. Thus the policy says it was issued "in consideration of the representations, agreements and warranties made by the insured;" and in the application the insured says: "I hereby represent and warrant that the statements and answers above and herein made and the statements accompanying are true and correct, and I have

not concealed, withheld or misrepresented any material circumstance or fact of the past or present state of my health, condition or habits of life, which the managers of the Ohio Valley Life Insurance Protective Union ought to be made acquainted with, or which renders me unfit for membership in said association.    That these answers or statements not written by me were written on my dictation and at my request and constitute warranties on my part."    But in apparent contradiction of these sweeping phrases there follows directly afterwords this language: "And if the same be in any *material* respect untrue or false or *tend to deceive* said association, then this contract shall be void."    And in the fourth clause of the policy this application containing these phrases is made a part of the policy.    It may be regarded as settled, that in construing a policy the courts lean in favor of the construction, which makes a statement of the insured a representation rather than a warranty, and when taking the whole policy and papers referred to in it as a part of it together, it is doubtful, whether the parties intended, that the statements or answers of the insured should be regarded as representations or warranties, the Court will construe them to be representations and not warranties.    See *Wilkeson* v. *Connecticut Mutual Insurance Company*, 30 Iowa 119; *Campbell* v. *New England Mutual Life Insurance Company*, 98 Mass. 381; *Garcelon* v. *Hampton Fire Insurance Company*, 50 Me. 580; *Hall* v. *Howard Insurance Company*, 14 Wend. 385.    Applying these rules in this case it is true, that the applicant in one part of his application says: " I hereby represent and warrant the answers above are true and correct."    The words by themselves constitute a warranty.    But in the same application the applicant states: "if these answers and statements be in any material respect untrue or false or tend to deceive the association, this contract shall be void."    This unqualified warranty first set forth in the application of the insured immediately following the answers and also the unqualfied warranty, with which this application commenced "that he did thereby declare and warrant that he was then of sober and temperate habits, in good health, of sound body and mind and that he did usually enjoy good health and that his age at his next birth day was fifty-six years," are to be con-

strued in connection with the statements contained in the latter part of this application, "if these statements and answers be in any material respect untrue or false or tend to deceive the association, then this contract shall be void and any benefit to other persons at the death of the insured shall be forfeited to said association." When so construed according to the rules above laid down, they convert what might have been warranties into representations and require of us to apply the law, which belongs to representations and not to warranties, to this case. The law, as I understand, is, that, when a fact is specifically enquired about, by this specific enquiry the insurer shows, that he regards this fact as material ; and a misrepresentation contained in an answer to such question avoids the contract, though the court or jury may think the enquiry is not in reality material, that is, that a true answer would probably have prevented the policy from issuing, or if issued, would have caused the premium demanded to be increased. (*Miller* v. *Mutual Life Insurance Company*, 31 Ia. 266 ; *Campbell* v. *N. E. Mutual Life Insurance Company*, 98 Mass. 381-403.) If the answer to a question is untrue, the jury has no right to say, that the variation from the truth is as to a matter not material. (*Fitch* v. *Amer. Pop. L. Ins. Co.*, 2 New York Supreme Court Reports 247.) But whether a particular enquiry be made as to a fact or not any statement as to a material fact, which is a misrepresentation, will avoid the policy. (*Daniels* v. *Hudson River (F.) Insurance Company*, 12 Cush. 416). By a material fact is meant one which would probably have caused the policy not to be issued or caused a change of the terms, on which it was issued."

There has been a considerable diversity of opinion as to what constitutes a misrepresentation which avoids a policy. Some hold that, if the representation is materially untrue, it avoids the policy, even when it is made in good faith and is the result of ignorance. (*Campbell* v. *New England Mutual Life Insurance Company*, 98 Mass. 381, and *Vose* v. *Eagle Life and Health Insurance Company*, 6 Cush. 42.) But there are other cases, in which it is held, that a representation as to a material fact will not necessarily avoid a policy, simply because it is untrue, and that in addition to its untruth its

falsity must be known to the insured. (*Whalton* v. *Hardesty*, 8 El. & B. 232; *Anderson* v. *Fitzgerald*, 4 House of Lords Cas. 484, (24 Eng. L. & Eq. 1.) See also remarks of Lord Mansfield in *Ross* v. *Bradshaw*, 1 Blackst. 313, and in *Stackpole* v. *Lenion* cited in Park on Insurance, 392. See also *Rawlins* v. *Desborough*, 2 Moor. & R. 328, 333; *Hackman* v. *Feme*, 3 M. & W. 505; *Sweete* v. *Furlie*, 6 C. & P. 1.) It seems to me that no peculiar or arbitrary rule should be applied to life-policies. After a long controversy in England it may be now regarded as well settled there, that to make a vendor responsible in damages for a representation, which turns out to be untrue, it must be made *mala fide* and not in the *bona fide* belief that it is true. And this is supported by the weight of American authorities. See *Crislip, guardian,* v. *Cain*, 19 W. Va. 471 and 472, where these English cases are all cited. But it should always in this connection be borne in mind, that, if one represents as personally known to him what is not true, though he may believe it, he has in contemplation of law acted *mala fide*, and is guilty of a legal fraud though he may in point of fact have acted *bona fide*; and in such a case he is responsible for any injury resulting from his false representation. (*Cabot* v. *Christie*, 42 Vt. 121; *Hamut* v. *Emerson*, 27 Maine 308, 326; *Bennett* v. *Judson*, 21 N. Y. 238; *Stone* v. *Deemey*, 4 Metc. 151; *Howard* v. *Erwin*, 18 Pick. 95; *Fisher* v. *Miller*, 103 Mass. 506.) These cases are cited and this doctrine considered and approved in *Crislip, guardian, &c.* v. *Cain*, 19 W. Va. 491 to 493.

This doctrine has peculiar and special application to policies of life-insurance; for it is obvious, that most of the facts set out especially in the applications now generally attached to the policy and expressly made a part of it are facts peculiarly within the knowledge of the insured and, whether he says so or not, must be regarded as stated on his own personal knowledge, and hence with reference to most facts, especially when stated in answer to questions propounded to him, he must be regarded as making them on his own personal knowledge and as being by him intended to be so understood by the insurer. This being the case, if a part of this discription is untrue in point of fact, he is guilty of legal fraud, though he may not have intended to deceive, and really did

not act *mala fide* in point of fact.  But sometimes facts are
stated by the insured, which the insurer must from the nature
of the fact stated have known were not stated as facts abso-
lutely true and within the personal knowledge of the insured.
When the fact stated is of this description, on the principles
we have laid down the policy should not be avoided, merely
because the statements turn out afterwards to be in point
of fact untrue, if the statement was made in perfect good
faith and with the full belief, when the statement was made,
that it was true.  Of this character would be a statement in
an application that the insured was of " sound body;" for of
course the insurer must have understood such a statement as
made not upon the personal knowledge of the insured, but
upon his belief from all the knowledge he had of his con-
stitution.  For of course men sometimes believe they are
of " sound body," when in point of fact they have some " in-
ternal disease," which in its character is fatal.  When such
a statement as this is made in an application for a life-policy
on the principles we have laid down the policy is not for-
feited, if the statement turns out to be untrue, if, when it
was made, the insured believed, that he was of "sound body"
and had no suspicion, that he was the subject of an "internal
disease" fatal in its character.  If on the other hand, the in-
sured in his application should state in answer to a question,
that he had not had a serious illness for seven years, this state
ment the insurer must have regarded as made on his own per-
sonal knowledge; and if in point of fact it was untrue, on the
principles we have stated it must forfeit the policy, though he
did not make the statement in point of fact *mala fide*, that is,
with a purpose of deceiving, but only from thoughtlessness
or forgetfulness, or because he had forgotten that a serious
illness, which he had had, was within seven years.

   I apprehend that the conflict of authorities on the question,
whether there must be fraud in a misrepresentation of a fact
in order to avoid a policy, has arisen principally from a fail-
ure to distinguish between actual fraud, that is, a misstate-
ment of a fact made with the intention of deceiving, and legal
fraud, which is a mistatement of a matter within the personal
knowledge of the insured or of such a character, that the insured
must have regarded it as within the personal knowledge of

83

the insured. Such a mistatement of a matter of this character is a legal fraud, though it was not made with intent to deceive. And I apprehend the law to be that a misrepresentation of a fact made by the insured, whether such misrepresentation be an actual fraud or a legal fraud, will avoid a policy; but if there be an absence of all fraud legal or actual in the misrepresentation of a fact, such misrepresentation will not avoid a policy.

I will now apply this law to the facts proven in this case. The additional specifications of defence filed by order of the court set out all the grounds of defence, on which the defendant below can rely. They are that the fifth clause of the policy was broken, as George Schwarzbach's death was caused by dissipation and drunkenness. The jury by their verdict found otherwise; and certainly the evidence on this point would not justify us in setting aside this verdict. This defence says further that the statements and declarations in the application of the insured were found in material respects untrue in three particulars: 1. "The statement that the insured was then of sober and temperate habits were untrue." The jury in effect found otherwise; and the evidence certified certainly would not justify our setting aside this verdict on that account.

2. "The statement that he was in good health and of sound body was untrue." There is no evidence to show that he was not then in good health. But the evidence does show that he was not then "of sound body". The evidence shows, that for at least three or four months before he had this policy issued and made this statement, he had a cancer of the stomach, and that this disease continued exhibiting itself only occassionaly till his death some eight months after he was insured." This representation was therefore untrue. But, as we have seen, it belongs to that class, which, the insurer must have known, was not made on the personal knowledge of the insured. And this being the case, if the insured acted in perfect good faith in making the statement and had then no suspicion, that he was not "sound of body," such a statement, though it turned out afterwards to be untrue when the statement was made, would not forfeit the policy. The jury on the evidence by their verdict found, that in mak-

ing this statement the insured acted in good faith; and we cannot set aside the verdict on the assumption that they could not have fairly drawn this inference from the evidence. He had had an attack some three months before, in which he had vomited blood four or five times; but he had apparently entirely recovered from this attack. The cause of his vomiting blood was then unknown not only to the insured but to the physician who attended him. The insured had, so far as his physician could tell, no reason to suppose there were any lingering effects of this attack in his system, when he was insured. He had an ulcer in the stomach; but it was proven, that this may exist without the person, who has it, feeling it at all. As the jury would have in this case to learn, if possible, whether the insured had, when he said he was "sound of body," any suspicion that he had then an ulcer in his stomach, it is obvious, that the court did not err in permitting the enquiry, whether he had, so far as the physician could tell, any reason to suppose that any effects of his previous attack remained in his system, though the defendant objected to the question. From the whole evidence I do not think the jury erred in the inference it apparantly drew, that the insured acted in good faith and stated what he believed to be true, when he averred that he was "sound of body." If this be so, the fact, that he was not then "sound of body," does not vitiate the policy; and the verdict of the jury can not be set aside because of the evidence on this point.

Defence No. 3 is: "The statement that he did usually enjoy good health is untrue." This defence is not sustained by the evidence, or at least the jury from the evidence were justified in the conclusion, that he did, when he was insured and prior thereto, enjoy good health.

Defence No. 4, that "He was not and had not ever been addicted to the frequent or intemperate use of alcoholic stimulant was untrue," was not sustained by the evidence; and the jury might well, as they did in effect, find otherwise.

Defence No. 5 is: "That the statement in answer to questions in paragraph thirteen, that the applicant had never had consumption or spitting of blood, was untrue." A sufficient answer to this defence is, that there is no evidence,

that the insured ever made such statement. It was proven that these questions in paragraph thirteen were never put to him, and that when he signed the application, no answer to any of the questions in paragraph thirteen were filled up; that these answers were filled up subsequently, but at what time or by whom it does not appear. The jury had a right from the evidence to infer, that it was done subsequently to the issuing of the policy.

The sixth matter of defence was that the statement that "insured had not had during the last seven years any disease or severe sickness, was untrue." If we are to regard this answer as made by the insured to a special question propounded to him, as the application on its face shows it was, and no legal replication was made and sustained, then in my judgment on the facts proven the jury were bound to find for the defendant. For this answer being to a direct and specific enquiry must as a matter of law be regarded as material; and, as it was about a matter, of which the insured must have had personal knowledge, it is immaterial whether he made the answer thoughtlessly, or because he deemed the question immaterial. It matters not, whether he intended by such answer to deceive the insurers or not; for such an answer, if untrue, was a legal fraud upon the insurers, as the evidence shows clearly that he had a disease or at least a severe sickness three or four months before. The vomitings of blood he then had and his sickness then was the only disease or severe sickness, which he had had in the previous seven years, so far as the evidence shows. The jury had a right determine whether this attack was a severe sickness or a disease. (*Manhattan Life Insurance Company* v. *Francisco*, 17 Wall. 672; *Mutual Benefit Life Insurance Company* v. *Wise*, 34 Md. 582.) But that this sickness as proven by the evidence was a disease or severe sickness, we think there can be no doubt. (*Geach* v. *Ingalls*, 14 M. & W. 95; *Vose* v. *Eagle Life and Health Insurance Company*, 6 Cush. 42; *Price* v. *Phenix Accident Life Insurance Company*, 17 Minn. 497.)

The seventh defence was that the statement in answer to the eighteenth question was untrue. The question was: " Has either of your parents or any brother or sister or near relative of yours been affected with rheumatism or with any

pulmonary, scrofulous or hereditary disease? If so, state fully."

The answer was, "No." There was no evidence, which even tended to contradict this answer or to show it to be untrue. It was endeavored to be shown, that years before the insured had stated that he had brothers and sisters. This evidence was in this case properly excluded, as we have seen. But had it been proven, that the insured had brothers and sisters, it would not have sustained this defence, unless it was shown they were subject to some of the diseases named, and there was no attempt to prove this even by hearsay.

The eighth defence is that the insured answered he had no brothers or sisters. There was no evidence that he ever had, which fully answers this defence.

The last defence is that the warranties in this policy were broken. We have seen that when properly construed there were no warranties in this policy.

It remains to enquire whether the replications of the plaintiffs to these defences are sufficient in law and are sustained by the defence. The first of these replications is a general denial of the truth of the matters set up in defence; and the other is, that the matters set up as a defence, where they existed, were fully known to the defendant below, and with such knowledge it made two assessments on the insured on account of this policy and under its terms, which assessments were paid by the insured in order to keep this policy in force; and that the defendant is thereby estopped from claiming, that this policy is forfeited by facts which were so known to it, when it made these assessments. Two questions are here raised. The first is whether the answer to the seventeenth question, which, we have seen, was false and would work a forfeiture of this policy, was the answer of the insured. The question was: "Have you had during the last seven years any disease or severe sickness? If so state the particulars of each case and the name of the attending physician." The answer to this question was, "None." This question was in the printed form for applications made out by the defendant below and handed to its various agents, and among others to its W. C. Peterman, whom the defendant paid for each application it got through him, which was regarded as satisfactory,

and on which it issued a policy; but on such applications as he presented, which were not regarded as satisfactory, and on which it refused to issue a policy, it paid nothing to the agent for the trouble he had taken in the matter.   So that under this system adopted now, it is believed, by all or nearly all life-insurance-companies, their agents to procure applications have a direct pecuniary interest and generally a large one to procure applications, on which the insurance-company will issue policies; and in order to do so these agents frequently take the preparations of such applications into their own hands and procure the signature of the insured, who trusting to the agent has not read the application.

It has been insisted, and formerly it was generally held, that under such circumstances the insured or assured should be bound by the written application signed by the insured, unless some device was resorted to for the purpose of preventing the insured reading the application which he signed.   And on general principles, which are applied to ordinary business transactions, this would seem to be right and the insured or assured ought to be bound.   But to apply these principles in their full force to the system, which is now almost universally adopted by companies to obtain policies of insurance both for life and against fire, would be a snare and delusion leading, as it has done in numerous cases, to the grossest frauds, of which insurance-companies receive the benefits; and the parties supposing themselves insured are the victims.

The modern and better opinion is, that where this course has been pursued by the agent to obtain policies of an insurance-company, the description of the risk or the facts set out in the application, though nominally proceeding from the insured, must be regarded by the court as proceeding from the insurers. (See *Plumb* v. *Cattarangus Co. Mutual (Fire) Insurance Company*, 18 N. Y. 392; *Rowley* v. *Empire (Fire) Insurance Company*, 36 N. Y. 550; *Woodbury Saving's Bank and Building Association* v. *Charter Oak Fire and M. Insurane Company*, 31 Conn. 517; *Masters* v. *The Madison Co. M. Insurance Company*, 11 Barb. 624; *The Columbia Insurance Company* v. *Cooper*, 14 Wright 331; *The Malleable Iron Works* v. *The Phœnix Insurance Company*, 25 Conn.

465; *Union Mutual Insurance Company* v. *Wilkison*, 13 Wallace, 222.) In this last case the whole subject is reviewed at considerable length, and the grounds are stated, on which the insured is not held bound by answers in his application, though signed by him, if they be not his statements but those of the agent of the insurance company, and he was when he signed the application not aware that such untrue answers had been inserted in his application; and these principles have been sustained or at least countenanced in many other cases. (*Crane* v. *The National Insurance Company*, 16 Md. 209; *Beal* v. *The Park Insurance Company*, 16 Wis. 241; *Molier* v. *The Pa. Insurance Company*, 5 Rawle 342; *Combs* v. *Hannibal*, 43 Mo. 148; *Bartholamew* v. *The Merchant Insurance Company*, 25 Ohio 507.) Though the weight of the modern authorities as well as reason in my judgment leads to the conclusion, that, where an application for a policy, which is filled up by an agent of an insurance-company and signed by the insured on the faith, that it has been properly filled up, who has not read the application, though he had an opportunity to do so, if none of the false answers were given by him but were inserted by the agent of the insurance-company either fraudulently or by mistake, where the mistake was not the result of anything said or done by the insured, the insured or assured is not bound by such false answers inserted in the application, but these answers should be regarded as the act of the insurance company by its agent and not as the act of the insured. It is true this position is still controverted by respectable authorities. (See *Barrett* v. *The Union Insurance Company*, 7 Cush. 175; *Lee* v. *The Howard Insurance Company*, 3 Gray 583; *Abbott* v. *Shawmut Mutual Fire Insurance Company*, 3 Allen 813; *Mallory* v. *Shawmut Mutual (Fire) Insurance Company*, 4 Allen 116; *Dowhees* v. *Manhatton Fire Insurance Company*, 35 N. J. 366.) But outside of Massachusetts the weight of authority now seems to be in favor of the position, that under circumstances above stated false answers in the application for an insurance will not forfeit the policy; and I concur in this view.

In this case Peterman, the agent of the defendant below to get applications, states that some few of the questions in the

printed application furnished him were read and answered
by the insured, but most of them were not.  He can not re-
member which of the questions he asked, but thinks he asked
him in regard to his father's age and his mother's age and
others.  He did not ask the questions generally because he
knew about them, as he says, pretty nearly as well as the in-
sured did himself, for they had almost always been together
every day.  He states that he asked him no question about
diseases, because he knew he had never been sick to his
knowledge but once, which was four or five years before his
death, when he sat up with him.  He filled up the answer to
the seventeenth question, which was that he had not during
the last seven years any disease or serious sickness.  This
answer was, as we have seen, false and its falsity was unknown
to this agent of the defendant below; but he seems to have
known that this answer was not strictly correct, as he knew
of a sickness of the insured some four or five years before,
which was apparently severe or may have been so at least.
His answers to the various questions in the thirteenth para-
graph he left blank, and they were not filled up when the ap-
plication was signed by the insured.  The insured signed
this application in the agent's presence and could have read
it, as he had it in his hands, after he had signed it, but the
agent did not know whether he read it or not.  The pre-
sumption is of course that he read it; and this is a strong
presumption.  But despite this presumption the evidence was
strong to show, that he never did read it or know that the
agent had filled up an answer so as to make this paper state,
that he had not had a disease or a severe illness within the
last seven years.  This agent of the defendant below states,
that, after he had signed the application, he had the paper in
his hand, that he was standing up with others in the saloon
and was talking about other matters.  From this evidence
the jury had a right to infer that he did not read the paper
or know how the answers to questions, which had not been put
to him, were filed up, but trusted to this agent to fill them up
correctly, a trust induced by the fact, that he was a friend
whom he was with every day, and who, he presumed, could and
would fill up the answers correctly.  This evidence at least
was such, that we are not authorized to set aside the ver-

dict of the jury, because they drew the inference, that the application was not read by the insured, especially as it appears by a question propounded to and answered by the examining physician of the defendant, that insured not only had no intention of deceiving the defendant, but also that he had regarded the sickness, which he had some three or four months before, as such a slight attack, that it was deemed unnecessary to state it, even when a question was asked, which called for its being stated, (the seventh question put to the examining physician appearing on his certificate, and which the certificate states was made after an examination of the insured.) It appears on the face of this certificate, that the defendant in a paragraph printed on the form of this certificate requested this medical examiner to be very minute in his examination of the applicant. After such careful examination, it is to be presumed, and after, it is presumed, conversing with the insured on the subject he answers the seventh question in a manner to show, that he was made aware of this sickness in the August preceding. This seventh question was: "Is he free from any tendency to cough, catarrh, vitiated expectoration, *spitting of blood,* difficulty of breathing, or disease of the throat?" The answer was, "No;" that is, that he was not free from those symptoms of disease; and the insured signed a paper at the foot of this physicians's certificate stating, that he had given true answers to all questions put to him by the examining physician. This seems to indicate pretty clearly that he did not know what answers had been put to the questions about diseases, to which he might be subject, which appear to have been written in his application. For this answer is inconsistent with them.

Was the second replication of the plaintiffs in law a good reply to the defence of the defendant? That is, did the fact, that the defendant below knew, when it issued this policy, that the insured had had a disease or a severe sickness within seven years before this policy was issued, estop it from relying on this fact as a forfeiture of the policy? That this is a good replication to a defence, that there was in the application a misrepresentation of a material fact, is sustained by the authorities and is supported by reason. (*Lindman* v. *Desborough*, 3 C. & P. 353; *Pwrim* v. *Lewis*, 2 F. & F. 778; *Swift*

84

v. *Massachusetts Mutual Life Insurance Company*, 2 N. Y.)
The question when an insurance company is chargeable
with knowledge of a fact known to its agent but not really
known to the principal, has given rise to many cases, in
which nice distinctions are drawn. But if it is shown, that
the principal knew the fact before the issuing of the policy,
it seems clear enough, that he is estopped from relying on
this fact as a forfeiture of the policy; and on general princi-
ples a knowledge, which would be sufficient to lead any pru-
dent person to enquire about the matter, when it could easily
be ascertained upon such enquiry, ought to be regarded as a
knowledge of the fact.

· In this case the certificate of the examining physician was
one of the papers which formed the basis, on which the life
policy in this case was issued; and the answer to the seventh
question certainly pointed out to the defendant, that the
applicant for the insurance was probably subject to some
serious disease. Having this knowledge the defendant can
not claim, that the policy is forfeited by the fact, that the in-
sured had a disease, which had exhibited itself some three
months before the application, unless the applicant practiced
actual fraud and designed deception in the false answers, which,
we have seen, he did not. But it is regarded as not sufficiently
established, that, when the policy was issued, the defendant
knew, that the applicant for the policy was not sound and
free from disease and ought therefore to be regarded as know-
ing that he vomited blood a few months before, yet it is well
established, that the defendant knew this fact well prior to
his death; and the jury from the evidence had a right to
infer, that this came to the knowledge of the defendant
shortly after the policy issued, which was on October 29, 1880.
We can not set aside the verdict of the jury, because they
inferred, that the defendant acquired this knowledge shortly
after the issuing of the policy and before March 24, 1881.
And yet on that day and afterwards, on April 30, 1881, and
May 31, 1881, they received assessments on this policy from
the insured. This was a waiver of the forfeiture of the
policy. (*Frost* v. *Saratoga (F.) Insurance Company*, 5 Denio
154; *Campbell Mutual Insurance Company* v. *Mitchell*, 48 Pa.
374; *Neal* v. *Genesser Mutual (F.) Insurance Company*, 19

Barbour 440; *Elliott* v. *Lycoming Co. Mut. (F.) Ins. Co.* 66 Pa. St. 22.)

Our conclusion for these reasons is, that the court below did not err in refusing to set aside the verdict of the jury and to grant a new trial. The jury made apparently no mistake of law to the prejudice of the plaintiff in error. The three instructions given to them were all offered by the defendant; and they certainly state the law favorably enough for the defendant. The third of these instructions is according to the views, which I have expressed, too favorable to the defendant. As it states in effect, that, if the insured had the opportunity to see the application, after it was written, and before it was delivered, it would be the same in effect, as though he had read it, before it was delivered. This we think is not the law; but it is obviously an error, of which the plaintiff in error can not complain, not only because he asked this instruction, but also because it was an error in his favor.

I have considered all the errors, which the court below is claimed to have committed relied on by the counsel for the plaintiff in error; but the counsel for the defendants in error insists, that under the pleadings and statements of defences filed by the defendant below that plaintiffs below were not bound to furnish any evidence, that the proof of the death of the insured had been furnished the defendant below. In *Cappellar* v. *Queen Insurance Company*, 21 W. Va. 577, point 7 of the syllabus, this court decided that "under chapter 66 of Acts of 1877 these statements, whether filed by the plaintiff or defendant, are not in the nature of pleadings, but are in the nature of notices to the adverse party of the claim or defence to be set up against him." They resemble closely bills of particulars heretofore required to be filed in certain actions. Chapter 66 of Acts of 1877 has been re-enacted in chapter 71 of Acts of 1882, section 61 and subsequent sections 164-65-6. Under these sections it is necessary for the defendant to file a statement of his defence sufficient to notify the plaintiff of the nature of his defences; and if it fails to do so, the court, if asked at the trial, should exclude the evidence of the defence as to any matter, which it has failed to so state. But under the policy in this case the amount named in it was not

payable till ninety days after the proofs of the death of the insured had been furnished to the company. And therefore the plaintiffs, in order to make out a *prima facie* case, were bound to prove, that when the suit was instituted, the amount of the policy was due, that is, that ninety days had elapsed after the proofs of the death of the insured had been delivered to the defendant. If the ninety days had not elapsed, or the proofs of the death of the insured had never been delivered to the company, then, to make out a *prima facie* case, the plaintiffs as a part of their case would have to prove, that the company had formerly or informally waived either the delivery to it of the proof of the death of the insured or the lapse of ninety days after the delivery of these proofs. This evidence being necessary to prove the plaintiffs' case, the defendant could demand it without filing any statement notifying the plaintiffs, that it relied upon the failure to deliver these proofs of death ninety days before the institution of the suit. For this did not constitute a defence, but was necessarily a part of the plaintiff's case ; and it is only of its defences that the defendant is bound to give notice by including them in the statement of defence which he files. It was therefore necessary for us to consider, whether these proofs of the death of the insured had been delivered to the defendant ninety days before this suit was instituted, though nothing was stated by the defendant as to its relying on the failure of the plaintiffs to furnish these proofs as required by the policy.

As was said in *Fawcett* v. *Railway Company*, 24 W. Va. 762, the court below ought to have refused to sign any bill of exceptions in the form of the bill of exceptions in this case. If by presenting such bill of exceptions the defendant desired to show, that the verdict of the jury was wholly unwarranted by the evidence, the exception should have stated the facts, which in the judgment of the court were proven. This practice of setting out the evidence precisely as it was given and the whole of it, including a vast amount of irrelevant matter copied from the stenographer's notes, or made out by him, I suppose, from his notes, imposes on this Court a vast amount of useless labor; and while it may save the counsel for the exceptor some labor at the time such exception is

taken, it imposes on him more labor in this Court and is prejudicial to his interests here, as this Court must necessarily give less weight to his testimony than the court below might do, who had just heard the evidence. If the object of taking the exception in this form is to get this Court to pass upon the ruling of the court objected to by the exceptor during the trial, whether in admitting or rejecting evidence or in granting or refusing instructions, while it may save the exceptor from trouble, where the court below has a stenographer, yet it imposes much unnecesary labor on this Court. For to pass on such questions we desire only to know, whether the evidence was relevant or irrelevant or the instructions pertinent or impertinent; and this can be shown by a very brief statement, preceding each of these questions to be submitted to the Court, that evidence had been introduced tending to prove certain facts, which would enable this Court, to see whether the evidence, about the admissability of which there was a dispute, was relevant or irrelevant, and whether the instructions asked or refused were pertinent or impertinent. But. though this bill of exceptions was thus highly objectionable in its form, I have considered all the questions involved in it, which have been argued by counsel, and which were in any degree doubtful. I have regarded counsel as in some degree excusable for presenting these questions in this objectionable manner, as when this case was tried this Court had laid down no rules as to the mode of preparing bills of exceptions. But hereafter no bill of exceptions prepared by counsel can be signed by a court below when presented in this form without violating the rules laid down by this Court. 23 W. Va. 817--818.

The judgment of the municipal court of Wheeling rendered on November 11, 1882, must for the reasons I have stated be affirmed; and the defendants in error must recover of the plaintiff in error their costs in this Court expended and damages according to law.

AFFIRMED.