FINCH v. MODERN WOODMEN OF AMERICA.

1. MUTUAL BENEFIT SOCIETIES — APPLICATION FOR MEMBERSHIP.— FALSE REPRESENTATIONS.

To the question in an application for membership in a mutual benefit society, "Has any examining physician for a life-insurance company or order declined to recommend your application?" the applicant answered, "No." The answer was untrue. The application in terms made the truth of each answer a condition precedent to the validity of the certificate of insurance issued thereon, and neither the company nor its agent was advised of the falsity of the statement at the time the risk was accepted. *Held,* that the certificate was void.

2. SAME—COLLECTION OF ASSESSMENTS — WAIVER OF FORFEITURE.

The collection of an assessment from a member of a mutual benefit society does not constitute a waiver by the society of a provision in the benefit certificate that it should be void if the statements contained in the application for membership were untrue, where the officers were not aware of any false statements when they accepted payment.

3. WITNESSES—MATTERS WITHIN KNOWLEDGE OF DECEDENT.

The statute excluding testimony as to matters which, if true, were equally within the knowledge of deceased, does not apply to third persons not parties to the litigation.

Error to Marquette; Stone, J. Submitted June 16, 1897. Decided July 13, 1897.

*Assumpsit* by Jane Finch against the Modern Woodmen of America upon a benefit certificate. From a judgment for defendant on verdict directed by the court, plaintiff brings error. Affirmed.

*F. H. Peters* and *S. W. Shaull*, for appellant.

*J. G. Johnson*, for appellee.

MOORE, J. The plaintiff is the beneficiary named in a certificate of insurance issued by the defendant, a mutual benefit association, upon the life of Loren C. Finch, her husband. The defendant interposed as a defense that the answers made in the application for insurance were untrue, and that, according to the terms of the contract, the certificate was void. The trial judge directed a verdict in favor of defendant. Plaintiff appeals.

Mr. Finch was a resident of Negaunee. He was solicited by Mr. Byrns, a deputy head consul of defendant, who was authorized to solicit members and to establish camps, to become a member of the camp at Ishpeming, three miles away. He made a written application, which was filled up by Mr. Byrns, and presented to the Ishpeming camp. The application was at once referred to a committee composed of men who knew Mr. Finch. They at once reported favorably. The camp voted favorably for his admission, and his application was referred to Dr. Andrus, the examining physician of the camp. Mr. Finch appeared for examination, and was examined at least once, probably twice, and perhaps three times. Dr. Andrus found traces of albumen in the urine, and came to the conclusion that Mr. Finch had Bright's disease, and testified that he so told Mr. Finch. It is claimed on the part of the plaintiff that in an interview between Mrs. Finch, Mr. Peters, her attorney, and Dr. Andrus, the doctor informed them that he saw Mr. Finch but once, and made a partial examination of him. Just what occurred after the examination made by Dr. Andrus on the part of the Ishpeming camp in relation to this examination is not very clearly disclosed. The record which contains the names of rejected applicants does not contain the name of Mr. Finch. The card containing his application is in possession of the camp, and is indorsed with the action of the committee, the result of the balloting, and has written upon it in pencil the word "Rejected." This is in the handwriting of Mr. Rowley, who was then the secretary of the camp. When it was written does not

appear., A little later, Mr. Byrns organized a camp at Negaunee. April 30, 1894, Mr. Finch made application to become a charter member at the solicitation of Mr. Byrns. His application was filled out by Mr. Byrns. He was examined by the local camp physician, who had known him for some time. His urine was examined. The camp physician regarded him as a good risk, and so reported him. A certificate of insurance was issued to him. He became a member of the Negaunee camp. In the following winter he had la grippe, but seemed to recover from it in the spring, so that he was about his work. Later he was taken ill, and November 24, 1895, died from Bright's disease, or heart trouble, or both.

The record discloses that, after Mr. Finch became a member of the Negaunee camp, Dr. Andrus had some correspondence with the head physician. Dr. Andrus testified:

"I have corresponded with the company in regard to this case, but not since the death. I don't remember the exact date I did correspond with the company before the death. I think it was in the fall of 1895. I corresponded with the head physician. I told him of the examination I had made, and of the result of it."

Mr. Finch, while a member of the Negaunee camp, paid all his dues, including an assessment made November 1, 1895. A number of the neighbors of Mr. Finch were sworn as witnesses, who testified to his appearing to be in excellent health in the spring of 1894 and prior thereto, and there is nothing in the record to show that he was not a desirable risk in the spring of 1894, except what resulted from the examination made by Dr. Andrus.

The application for membership, among other things, contained the following:

"*Question:* Do you understand the objects, organization, mode of government, and laws of this order, and particularly that part of the laws providing for the qualifications for and restrictions upon membership, and providing for the forfeiture of indemnity for untrue state-

ments or answers in application, or failure to pay dues and assessments?

"*Answer:* Yes. * * * I am not now a member of this order. I have not within six months, and never more than three times, been rejected therein. I have never been expelled from any camp of this order, and am not now under suspension in any such camp.

"*Q.* If now a member, to what camp do you belong, and what is the amount of your benefit certificate?

"*A.* Not a member. * * * I am of sound body and mind, and free from disease or injury. I do hereby consent and agree that this application and the laws of this order shall form the sole basis of my admission to and membership in this order, and that any untrue or fraudulent statements or answers made to the camp physician, or any concealment of facts, intentional or otherwise, in this application, shall forfeit the rights of myself and my beneficiaries to all benefits and privileges therein or arising therefrom.

"*Q.* Have you ever been rejected by any life-insurance company or mutual benefit association? If so, give year and company.

"*A.* No.

"*Q.* Have you ever made application for life insurance or benefit, and withdrawn same before final action? If so, give year and company.

"*A.* No.

"*Q.* Has any examining physician for life-insurance company or order declined to recommend your application? If so, give name and address.

"*A.* No.

"*Q.* Have you ever had difficult, excessive, or scanty urination?

"*A.* No.

"*Q.* Or any disease of the urinary or genital organs?

"*A.* No.

"*Q.* Have you ever had any disease of the following-named organs, or any of the following-named diseases or symptoms: Kidney diseases, * * *?

"*A.* No.

"applicant will please note this clause:

"I have verified each of the foregoing answers and statements, adopt them as my own, whether written by me or not, and declare and warrant that they are full, complete, and literally true, and I agree that the exact

literal truth of each shall be a condition precedent to any binding contract issued upon the faith of the foregoing answers, and I hereby constitute and make the officers of the local camp and of the Modern Woodmen of America who have aided in making this application my agents for such purpose. I further agree that the foregoing answers and statements, together with the preceding declaration, shall form the basis of the contract between me and the Modern Woodmen of America, and are offered by me as a consideration for the contract applied for, and hereby made a part of any benefit certificate that may be issued on this application, and shall be deemed and taken as a part of such certificate; that this application may be referred to in said benefit certificate as the basis thereof, and that they shall be construed together as one entire contract; and I further agree that, if any answer or statement in this application is not literally true, that my benefit certificate shall be void."

The benefit certificate contained the following provisions:

"This benefit certificate is issued and accepted only upon the following express warranties, conditions, and agreements: *First.* That the application of said Loren C. Finch and medical examination, which is made a part thereof, for membership in this order, and which is on file in the office of the head clerk, and is hereby referred to and made a part of this contract for benefit, is true in all respects, and that the literal truth of such application, and each and every part thereof, shall be held to be a strict warranty, and to form the only basis of the liability of this order to such member and to his beneficiary or beneficiaries, the same as fully set forth in this benefit certificate. *Second.* That should said application, and each and every part thereof, not be literally true, then this benefit certificate shall, as to the member, his beneficiary or beneficiaries, be absolutely null and void."

Mr. Byrns was called as a witness, and testified, among other things, that, when he took Mr. Finch's application to become a charter member of the Negaunee camp, he knew he had already made an application for membership in the Ishpeming camp.

"I knew if that application had not been disposed of in some way he would not be eligible to membership in the

Negaunee lodge. I knew if he had been rejected he would not be eligible.

"*Q.* Didn't you know that if he failed to complete his application he wouldn't be within six months?

"*A.* Well, no; I can't say that. I didn't consider that that was an application until he completed the application,—completed the blank,—the medical examination was completed, and I was advised of such completion. I knew something about what had become of his application in the Ishpeming lodge from what he had said to me himself. I understood from Mr. Finch that he had some trouble with the medical examiner. He didn't propose to complete his examination through him.

"*Q.* When you wrote the second application,—when you wrote the answer 'No' to this question: 'Have you ever made application for life insurance or benefit, and withdrawn the same before final action?' that answer was a false answer?

"*A.* No, I didn't consider it so. The way I interpreted that sentence was a benefit, or some application,—that is, completed that application blank, completed the filling of the application blank,—and then, learning after the application had been drawn that there was a possibility of his being rejected, of withdrawing it in that case, but not before the application had been completed; that is, entirely filled out and signed by the local physician. I wrote in the answer 'No' to the question, 'Has any examining physician of any life-insurance company or order declined to recommend your application?' He answered that himself. I wrote the answer in for him. He said he had not been rejected. I was soliciting applications for the Modern Woodmen of America. I was regularly commissioned deputy head consul. That business is to solicit applications, and what I did in that line was done for the company. That was my general business,—soliciting applications for them. I don't remember whether he took the application with him when he went to the physician at Ishpeming. I remember a conversation with Mr. Finch, in which he said he would not go to that physician again to be examined. I met him on one occasion, and asked him if he had been to Dr. Andrus for examination. He said he had been, and I asked him how it was, and he said he told him there was something the matter with his urine, and told him to come back again, and intimated to him that albumen was

in his urine.   He went back the second time, and I afterwards met Mr. Finch, and inquired if he had completed his examination.   He said he had been there again, and he still found a trace of albumen in his urine, and asked him to come back again the third time.   I said, 'You had better go back and complete your examination,' and he said—he made the remark—that he would not go back any more; he didn't propose to be fooled around in that way, and he wouldn't go back any more.   I tried to prevail on him to go back, and he insisted that he wouldn't go back. I can't say exactly how long before he made application to the Negaunee lodge that this conversation took place.   At all events, this first application and conversations were all prior to his second application at Negaunee.   At the time I took this application in Negaunee, I knew something was the matter with the man's kidneys.   He stated to me something was the matter; he had a trace of albumen. To the question in the application:   'Have you had any disease of the following-named organs, or any of the following-named diseases:   Kidney disease,' I wrote in the answer, 'No.'   I answered it in that way simply because it had not been determined that he had any trouble of that kind.   He told me that Dr. Andrus had found a trace of albumen in the urine, but it had not been determined that he had any kidney disease.   In every instance Mr. Finch gave me the answers I wrote down."

Cross-examination:

"In the conversation I had with Mr. Finch, he said he had been to see Dr. Andrus twice.   He said Dr. Andrus wanted him to come again.   He said he didn't propose to be fooled around by him, and refused to go back.   I have nothing to do with the insurance part of these applications, except to solicit the applications and complete the preliminaries.   What I mean by that is, take his application, and submit it in this original instance to the local camp.   In the Negaunee instance I didn't make any card applications at all.   I took his application and took all the applications on a charter blank, and then sent them to the local physician for examination.   He was a charter member of Negaunee camp.   I have nothing further to do with the insurance after they are turned over to the local camp physician, except to see that the beneficiary certificates are properly countersigned, signed by myself, and properly attested by the signature of the applicant

prior to its being delivered to him. I do not pass on these applications in any way. I have no authority to say that the man's application is all right or otherwise. I have no authority to make contracts for the order. That is done by other agencies besides myself. My work is to solicit applications, and turn into the regular channel."

Redirect examination:

"The local physician has a right to reject the applicant. In the first place, the local physician can reject him; in the next place, the head physician can reject him. But, at all events, the local physician or head physician, and the local camp by ballot, are the ones that do the rejecting. And the deputy, in the event of his ascertaining that the moral fitness of the applicant is such as would make him ineligible, he can reject him. Deputy is the position I hold. If it is discovered that an applicant has perpetrated a fraud, or has given an untrue answer, the matter is referred to the board of directors of the head camp."

It is claimed by the plaintiff that Mr. Byrns had all the knowledge possessed by Mr. Finch, and that his knowledge must be deemed to be the knowledge of the defendant, and that it is now estopped from interposing the defense it seeks to make. While the record is clear that Dr. Andrus rejected Mr. Finch, it is not clear that the camp did, and, if there were no other questions involved, it might perhaps be a question for the jury whether or not the camp did, in fact, reject Mr. Finch. It is urged that Mr. Finch answered truly about the kidney difficulty, and told Mr. Byrns that traces of albumen were found, but that Mr. Byrns did not put down the answer truly; that Mr. Byrns was acting for the company in taking the application, and his knowledge is its knowledge. In all the cases brought to our attention, but one of them has been a case where the application for insurance contained provisions the same as are contained in this application. The case of *Baumgart* v. *Modern Woodmen*, 85 Wis. 546, was a case based upon a like application. It is claimed that the answers bind Mr. Finch, irrespective of the knowledge Mr. Byrns might have, because of the

language of the application and the certificate. However, with our view of the case, it is not necessary to decide upon the effect of the failure of Mr. Byrns to record the answers to the questions just as they were given to him, or how far Mr. Finch was bound by the answers in the application, if Mr. Byrns had knowledge of the facts. In reply to the question, "Has any examining physician for a life-insurance company or order declined to recommend your application?" the answer was given, "No." The testimony shows that answer was not true. Dr. Andrus had declined to recommend Mr. Finch, and there is nothing to show that Mr. Finch so informed Mr. Byrns, or that he had knowledge of that fact. On the contrary, the testimony shows that Mr. Finch told him Dr. Andrus wanted Mr. Finch to call again for further examination, and the fair inference from the testimony is that he gave Mr. Byrns to understand that Dr. Andrus had not completed the examination. This was a material and important question. The company was entitled to have it truthfully answered. If the applicant had been rejected by an examining physician within two months, the company had a right to know it. And when it is not made to appear that either the company or its agent had knowledge of the fact, the untrue answer will avoid the policy. *Schwarzbach* v. *Protective Union*, 25 W. Va. 622 (52 Am. Rep. 227); *Brown* v. *Insurance Co.*, 65 Mich. 314 (8 Am. St. Rep. 894); 1 Bac. Ben. Soc. & Life Ins. §§ 218, 230.

It is said, however, that the testimony of Dr. Andrus was improperly admitted, because his testimony was equally within the knowledge of Mr. Finch. Dr. Andrus was not a party to the litigation. The provisions of the statute did not apply to him. His testimony was competent.

It is also urged that, after Mr. Finch became a member of the Negaunee camp, Dr. Andrus communicated to the head physician what facts he knew, and that afterwards an assessment was levied and paid, and that this was a

waiver; citing Nibl. Acc. Ins. & Ben. Soc. 565. The trouble with this contention is that the record does not disclose that the officers of the company or its head physician had knowledge of the untrue statements made before any assessment was made, and payment thereof received by the defendant. Nibl. Acc. Ins. & Ben. Soc. 565; *Adreveno* v. *Life Ass'n*, 38 Fed. 806; *Matt* v. *Protective Soc.*, 70 Iowa, 455.

We discover no error in the result reached by the learned trial judge. The judgment is affirmed.

The other Justices concurred.