### SOWICZKI *v.* MODERN WOODMEN OF AMERICA.

1. INSURANCE—WAIVER—MUTUAL BENEFIT ASSOCIATIONS.

   The clerk of a local camp of a beneficial society who was forbidden by the by-laws of the order from waiving any provisions of its policies could not waive that portion of the certificate which limited the persons who might become beneficiaries under the insurance policy to heirs, blood relatives, or persons dependent on the applicant or member of the family.

2. SAME—FRAUD—DIRECTING VERDICT.

   Evidence in plaintiff's behalf, that the insured caught a cold which developed into consumption, disputed by defendant, who claimed that he had tuberculosis when he took out a policy in defendant association, *held*, to present a question for the jury as to the cause of the disease and existence at the time of representations made as to his good health.

3. SAME—GOOD FAITH.

   Perfect good faith in answering the questions is required of the applicant by the law.

4. SAME—CERTIFICATE—PREVIOUS HEALTH, ETC.

   Where the applicant for fraternal insurance untruthfully answered that he was married, and had not consulted a physician for seven years, and had never spat blood

or had certain diseases specifically described, in presenting his application for a benefit certificate, the beneficiaries were not entitled to recover on the policy, which was avoided by the fraudulent misrepresentations.[1]

5. SAME—FALSE REPRESENTATIONS.
     And answers relating to such subjects were material and, if fraudulent, avoided a certificate of insurance.

6. SAME—BENEFIT CERTIFICATE—EVIDENCE—PRESUMPTIONS.
     A presumption exists that the applicant answered and signed understandingly an application.

7. SAME—USE OF INTERPRETER—EFFECT.
     The fact that he applied through an interpreter did not of itself tend to prove that he was unable to understand the questions, applicant having lived in this country nine years and having said he understood English in the application, which was fully explained to him through the interpreter and examiner.

Error to Wayne; Cross, J., presiding. Submitted April 12, 1916. (Docket No. 123.) Decided July 21, 1916. Rehearing denied September 27, 1916.

Assumpsit by Ludwicka Sowiczki and a separate action by Anthony Sowiczki against the Modern Woodmen of America on a policy of insurance. Judgment for defendant on a verdict directed by the court. Plaintiffs bring error. Affirmed.

*Clarence P. Mulligan,* for appellants.

*Beaumont, Smith & Harris.* for appellee.

STEERE, J. In these two cases, combined by stipulation and heard as one, plaintiffs, who are husband

---

[1]For authorities passing on the question as to what "constitutes spitting or coughing blood" contained in an application for life insurance, see note in 23 L. R. A. (N. S.) 917. As to what constitutes a consultation with or attendance by a physician, within the meaning of an application for life insurance, see note in 18 L. R. A. (N. S.) 362, and as to time covered by question or representation as to consultation with physician, see note in 45 L. R. A. (N. S.) 162.

and wife, each brought an action against defendant for the sum of $500, claimed under and as specified beneficiary in a new benefit certificate issued July 29, 1913, by defendant to Steven Sowiczki, deceased, on his reinstatement after suspension in lieu of the original, issued on August 12, 1912, as to which he signed a "waiver of lost certificate." A trial of said case in the circuit court of Wayne county resulted in a judgment of no cause of action on a verdict directed by the court, on the ground that deceased in his application for insurance made untrue statements as to material facts, which by the terms of his benefit certificate were representations, warranties, and conditions on which the certificate was issued, and for the further reason as to Mrs. Ludwica Sowiczki that she was not qualified to become a beneficiary under defendant's by-laws and did not come within the terms of the policy.

Defendant is a foreign corporation organized and doing business as a fraternal beneficiary society with subordinate lodges or "local camps" in this and other States. The beneficiary certificate which it issued to deceased on August 12, 1912, through its local camp at Detroit, Mich., was for $1,000, and at his instance made payable upon his death to "Anna Sowiczki, Detroit, Michigan; relationship, wife." The undisputed testimony showed that he was never married, although then living with said Anna, ostensibly as his wife, and had lived with her in that relation for about six years. She testified that she made the payments on this certificate while living with him. They separated July 4, 1913.

On June 30, 1913, deceased was suspended from the order for nonpayment of dues. On July 20, 1913, he, or his brother for him, paid all his arrearages, and he made application for a new certificate, signing a waiver of the first, which named said Anna as beneficiary,

under a claim that it was lost, and changed from her to plaintiffs, Anthony Sowiczki and Ludwica Sowiczki, as beneficiaries in the sum of $500 each, stating in said waiver that the benefit certificate payable to "Anna Sowiczki, who bears the relationship to me of wife," had been lost, and it was not within his power to surrender it, but declared and agreed that the same should be void from the date of the new certificate, which he directed should be made payable to plaintiffs on his death, designating them separately, by name, as his brother and sister, at the same time certifying that he was then in good health. He was thereupon reinstated, and the new benefit certificate was issued to him as before noted, on July 29, 1913. It was conceded that he died September 10, 1913, of pulmonary tuberculosis.

Ludwica Sowiczki was his brother's wife and bore no blood relationship to deceased. He was a common laborer, born in Russian Poland on May 6, 1877, and came to the United States in 1903. At the time of his first application for membership and benefits in defendant society he was living with Anna Sowiczki on Livingston street, in Detroit, and working for the American Car & Foundry Company. She testified that she left him because she could not stand it and he chased her out; while his brother, Anthony, testified that deceased afterwards came to live with him "because she threw him out," about three weeks after Anna left him, and that in July, when they applied to have the "policy changed to me," deceased was "still living in his own home." This witness further said, "he lived with me two or three weeks before he died." Although his testimony is very conflicting as to the length of time deceased lived alone (he states it in one part of his testimony as two months), it is shown deceased died at plaintiff's home, where he had gone a month or more before his death under an arrange-

ment, as Anthony testified, that "he would pay board and live with us, and my wife would fix things up for him."

Deceased's waiver of lost certificate, in which he changed beneficiaries, signed on July 20, 1913, while he was "living in his own home," concludes as follows:

"I agree that the new benefit certificate hereby applied for shall be issued on and in consideration of my application for membership and benefits, and that said application, as it may be affected by the by-laws of the society now in force, shall be the basis of and the consideration for the issuance and delivery to me of such new benefit certificate."

Defendant's by-laws specify who may become beneficiaries as follows:

"Benefit certificates shall be made payable only to the wife, surviving children, or some other person or persons specially named in said benefit certificate as beneficiary, who are related to the member as heir, blood relative (blood relative meaning relationship not further removed than cousin in first degree), or persons dependent upon him, or member of his family whom the applicant shall designate in his application."

Plaintiff Ludwica Sowiczki bore to the deceased none of the relationships designated, nor was she dependent upon him, or a member of his family, either when he designated her as beneficiary or at the time of his death, although he became a boarder for pay in her home a few weeks before he died. Had she been designated by deceased in his application as a person dependent upon him, or as a member of his family, there might be possible color for the contention that such designation would relate to and speak from the time of his death, which would invite a more careful consideration in that connection of the word "family," recognized as "an expression of great flexibility" (*Carmichael* v. *Benefit Ass'n*, 51 Mich. 494 [16 N. W. 871]); but she was only brought within the class who might

be beneficiaries by untruthfully designating her as a "sister" of deceased, just as Anna was described as his wife, while it is admitted she was not.

Anthony Sowiczki testified that deceased told the clerk of the local camp that Ludwica was his brother's wife, which is denied by the clerk, and it is urged in behalf of plaintiffs that this raised a question of waiver which should have been left as an issue of fact to the jury. The contract of insurance was with the Great Camp, and by section 39 of the by-laws of the order to which the insured subscribed the clerk of the local camp could not waive this provision. *Showalter* v. *Modern Woodmen of America,* 156 Mich. 390 (120 N. W. 994) ; *Larkin* v. *Modern Woodmen of America,* 163 Mich. 670 (127 N. W. 786).

The more serious and meritorious objections, however, reaching the validity of this entire benefit certificate, are the answers deceased made to plain and pertinent questions bearing directly on his prospects of longevity at the time he first applied for membership and his warranty that he was in good health when reinstated. Under the by-laws tender of assessments for reinstatement by a suspended member is a warranty of then good health, and retention of such assessments until the head clerk or board of directors learns that such member was not in good health when he attempted to reinstate is not a waiver of suspension, and, if he was actually in poor health, will not have the effect of reinstating him nor entitle him or his beneficiaries to any rights under his benefit certificate. Anna Sowiczki, who separated from deceased a little over two weeks before he applied for reinstatement, testified that he was in poor health for over a year before that time, and had consulted several physicians who attended him when ill; that at times he would not be able to work, had pain in his back, stomach, and lungs, coughed, and she had seen him spit

blood often. On August 19, 1913, Dr. Laschajewski, who was called to attend him professionally, found that he was suffering with an advanced stage of tuberculosis, which soon proved fatal. Upon this subject the physician testified in part:

'I believe Steve Sowiczki was suffering from a chronic form of tuberculosis. For a chronic form of tuberculosis to reach an advanced stage is somewhat dependent; as a rule it takes a few months any way. * * * I am as positive as any man can be positive that the man was not in good health July 20th. * * * He had been suffering in that condition for at least several months. * * * It is generally conceded consumption is a lingering disease. It is a slow developing disease. It may take several months, and it may take years. * * * I know a large part of the lung was destroyed."

It is urged by the defense that such testimony shows conclusively, as a matter of law, against any testimony of plaintiffs, that deceased was not in good health when he applied for reinstatement. While this testimony is persuasive, there was also testimony of a contradictory nature. Plaintiffs' claim and theory is that death was caused by quick consumption resulting from a recently contracted cold. Other witnesses called by plaintiffs, mostly relatives or of his nationality, testified that he was, on and about July 20th, a strong, healthy man, working regularly as a watchman at that time, and was sick but a few weeks before his death. Blanche Kubina, in explanation of her observations of the recent development of his fatal illness, testified that when she saw him at Anthony's home about three weeks before his death he shook as if he had a cold, and said to her "I got awful sore because Anna left me, and I was on a drunk and I caught cold."

As a general rule, the question of whether a person is in sound or good health at a particular time is one of fact for the jury, if the evidence is at all conflicting

and we cannot under such testimony hold as a matter of law that there was no issue of fact as to whether on July 20th deceased was, or believed himself to be, in good health. But the testimony of his physician as to the nature of the disease of which he died, and of the woman with whom he then lived as to his health at and during most of the year following the time he joined the association, has a material bearing on the significance and good faith of his answers when applying for membership. In *Maine Benefit Ass'n v. Parks,* 81 Me. 79 (16 Atl. 339, 10 Am. St. Rep. 240), a case in which it was held that the insured had misrepresented and misled by answering that she was in good health when she was, in fact, in a consumptive or tubercular condition, that court made the following pertinent observations:

"The good faith of the answers should be perfect. The presence of it goes very far to protect a policy; while want of it would be an element of great power in the defense."

A copy of deceased's application, including questions asked and his answers as signed by him, was attached to and made a part of his benefit certificate and contract of insurance, with the following notice immediately under his signature:

"A copy of your application for membership is included in or attached to this certificate—read it. If any answer or statement therein is not correct notify the head clerk at once."

Amongst the plain and direct questions asked and answered by deceased were these:

"Are you married? Yes. If so, when? Sept. 10, 1904. Where? Detroit, Mich. * * * Have you within the last 7 years consulted any person, physician or physicians in regard to your health? No. (If this was answered affirmatively, ailments, dates and duration of attack, name and address of physician con-

sulted or by whom treated were required.)    Have you ever had, or has any physician ever. treated you for, or advised or informed you that you ever had  *  *  * (naming certain diseases) or any other disease, or any disease of the  *  *  *  liver or have you ever had *  *  *  spitting of blood or other hemorrhages? No."

All these answers were untrue.  He was never married, had consulted several physicians in less than seven years prior to that time, had been sick, unable to work, spit blood, and treated by a physician for a serious ailment scarcely two months before.  Dr. Buss testified that he was called professionally to treat deceased at his home, and visited him in that capacity two or three times during the week previous to May 31, 1912; that he was then sick, unable to work, confined to his bed part of the time, said he had vomited blood, and thought he was seriously sick; that witness in examining him did not make out there was anything the matter with his lungs, and pumped out his stomach to see if there was anything wrong with it, and made a tuberculine test to ascertain "if there was any infection of tuberculine there," and says, "At the time I examined him that week I came to no conclusion."  A Dr. Panzner was also called to visit deceased on June 3, 1912, and testified that he found him sick in bed, but made only the one visit, because he learned another physician had the case.  He stated that on that visit he diagnosed the patient's ailment as "probable cirrhosis of the liver," and told him "he had trouble in his liver," but was not positive of his diagnosis, because he "did not think one examination was sufficient."  Whatever his ailment at that time, it is undisputed that he was then sick, seriously as he himself thought and said, consulted with and was visited and treated by two physicians for a serious personal ailment of some kind, barely two months before

192 Mich.—18.

he in his application stated that he had not consulted a physician in regard to a personal ailment within the last seven years. The materiality and importance of truthful answers in that particular are obvious and universally recognized. The subject is interestingly discussed, and various authorities reviewed in *McDermott* v. *Modern Woodmen of America*, 97 Mo. App. 636 (71 S. W. 833). Upon representations touching the health of an applicant for insurance this court said in *Tobin* v. *Modern Woodmen of America*, 126 Mich. 161 (85 N. W. 472):

"As said in the case of *Modern Woodmen of America* v. *Von Wald*, 6 Kan. App. 231 (49 Pac. 782), it was provided by the contract that 'the certificate should be void in case of the untruthfulness of any of the answers, and neither the court nor the jury are at liberty to inquire into the materiality of the questions and answers, and, unless they are true, the beneficiary cannot recover.' See, also, *Mutual Benevolent & Aid Ass'n* v. *Hall*, 118 Ill. 169 (8 N. E. 764); *Ketcham* v. *Accident Ass'n*, 117 Mich. 521 (76 N. W. 5); *Continental Life Ins. Co.* v. *Rogers*, 119 Ill. 474 (10 N. E. 242, 59 Am. Rep. 810); *Finch* v. *Modern Woodmen of America*, 113 Mich. 646 (71 N. W. 1104)."

In avoidance of the effect of such answers it is contended by plaintiffs that deceased was questioned by the medical officer of the local camp through an interpreter, and whether the questions were properly asked and understandingly answered by deceased as written down in his application by the examiner should have been left to the jury as an issue of fact under the ruling in *Clark* v. *North American Union*, 179 Mich. 131 (146 N. W. 336), and analogous cases. In the *Clark Case* the examiner was unable to testify that he asked the applicant the question upon which the controversy turned, or that all the questions in the blank were asked, and from such a situation it was said an inference of fact might easily be drawn that

the questions were not asked, and where this is true it became an issue for the jury. We find no evidence in this case from which any such inference can be drawn to overcome the presumption that deceased was fully advised and understood the nature ·of these particular questions, at least, and his answers in the application signed by him. They were questions as to which there was little room for uncertainty or misunderstanding, whether deceased could· speak or understand the English language or not. It is not shown that he could not, except as inferable from the use of the interpreter, who was present and acted at deceased's request. A request for an interpreter is not uncommon or unnatural in such cases with those whose native language is foreign, where they can understand and speak English fairly well. Deceased had been in the United States nine years, and states over his signature in his application that he is "able to speak and understand the English language," and is "a citizen of the United States." The examiner testified that these questions were asked and answered through the interpreter, that he asked them correctly and recorded them as answered, and says:

"I read everything in this application to this man. It took from 25 minutes to half an hour. * * * I wrote in everything that appears under these answers."

The interpreter, a fellow countryman of deceased, who said he could read and write English some, and had told deceased, "Ir you feel sick, you never better step in; if you feel well, of course, the doctor can examine you," testified of how he came to act as interpreter, how the examination was conducted, and what was said, in part, as follows:

"Q. Did you ask him if he had talked to any physicians or had any physicians treat him?

"A. I asked him, and he said, 'No.' When I asked

him if he had any disease, he said not, and I told the doctor in English, and then I think the doctor write the answer down, he write it, he got a piece of paper. At that time I could not tell whether or not Anna was his wife. Steve asked me to be present when he was to be examined by the doctor. When these questions were asked, Steve was sitting in the kitchen. My daughter just happened to drop in the kitchen when this was going on. She asked Steve questions, too. We asked him a lot of other questions, too. The doctor asked him when he was born, what country he came from, whether he drank beer, whisky or anything, or sickness of any kind."

The testimony of these two witnesses is confirmatory of the presumption that this written application was understandingly signed by deceased, and we can discover no evidence in this record giving rise to any inference to the contrary which creates an issue of fact upon that proposition.

The judgment is affirmed.

STONE, C. J., and KUHN, OSTRANDER, BIRD, MOORE, BROOKE, and PERSON, JJ., concurred.